## WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO. et al.

(District Court S. D. New York. August 9, 1922.)

1. **Railroads ⟜208—Receiver may adopt or disaffirm lease.**

   A receiver for a lessee railroad company may disaffirm the lease at once or may operate the road for such reasonable time as will enable him to form a judgment and to present his conclusions to the court.

2. **Landlord and tenant ⟜112(2)—Acceptance of rental due under lease waiver of right to terminate lease for prior defaults.**

   Acceptance by a lessor without objection of an item of rental specified in the lease when due is a waiver of the right to enforce its remedies under the lease for prior default in payment of other items.

3. **Railroads ⟜208—Receiver for lessee, so long as he pays rental, operates property for account of lessee.**

   A receiver for a lessee of railroad property, so long as he keeps up the rental payments under the lease, operates the property for account of the lessee.

4. **Railroads ⟜208—Operation of leased property by receiver after default in payment of rental is for account of lessor.**

   After default by a receiver for a lessee in payment of rental under the lease, which entitles the lessor to re-entry, further operation of the property by the receiver is deemed to be with acquiescence of the lessor, and is for its account and at its risk, and the lessor is entitled to the net earnings, and is liable for any deficit.

**5. Street railroads** ⊂⊃58—Operation by receiver held to be for account of lessor.

The receiver for the lessee of a street railroad system for some two months paid items of rental under the lease as they became due and then discontinued, whereupon, on application of the lessor, he was ordered to return the property on a date specified. *Held*, that to the time of the order his operation of the road was for the lessee as its receiver, but after that time it was for account of the lessor, which was entitled to the net earnings.

**6. Corporations** ⊂⊃560(2)—Interlocking directorates or identity of receiver of two corporations held not to affect receiver's right to recover payment due from one to the other, as he represents creditors of both.

The right of the receiver of one corporation to exact from the receiver of another payments due from the latter is not affected by the fact that one corporation owns all the stock of the other and their officers are the same, nor by the fact that the same person is receiver for both, since he represents, inter alia, the interests of their several creditors.

**7. Receivers** ⊂⊃158(1)—Receiver for street railroad company held justified in paying bills for power furnished prior to the receivership.

A street railroad company, which furnished power, maintenance, and repairs to the lessee of another system, necessary to keep it in operation, has an equitable lien on the earnings of such system until it is paid, whether operated by the lessee, its receiver, or after it has been turned back to the lessor, and a receiver for the lessee was justified in paying from earnings bills for power, etc., furnished prior to the receivership.

**8. Receivers** ⊂⊃155—Receiver held liable for operating expenses of street railway.

While one furnishing material and supplies necessary for the operation of a street railroad has an equitable lien therefor on the current earnings, where they were furnished to a lessee and its receiver, as between the receivership estate and the lessor, to which the receiver returned the property, the receiver must pay for the same to the extent of his ability.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Brooklyn Rapid Transit Company and others. Questions as to rights as between lessor and lessee of street railroads and payments by receiver determined.

The following is the report of Special Master E. Henry Lacombe under order No. 79A and order No. 47B, of July 2, 1920:

On July 2, 1920, orders known as Nos. 79A and 47B, were made herein, referring certain specific issues to the special master, with instructions to take such proof with respect thereto as the parties may desire to submit, and to make a report, with his conclusions and recommendations thereon, with all convenient speed. The various issues referred to the master by this order may be conveniently set forth in separate paragraphs as follows, each presenting a separate question:

A. Whether or not the receiver of the Brooklyn Heights R. R. Company shall be legally considered to have operated the properties covered by the lease from the Brooklyn City R. R. Company to the Brooklyn Heights R. R. Company, dated February 14, 1893 (hereinafter called the Brooklyn City property), from July 15, 1919, to October 18, 1919, both inclusive for the account of said lessor Brooklyn City R. R. Company.

B. If so, what is the legal responsibility of said receiver to said Brooklyn City R. R. Co. in this regard.

C. What amount, if any, the Brooklyn City R. R. Co. is entitled to receive or be credited with in respect of any moneys derived from the operation of said Brooklyn City property during said period from July 15, 1919, to October 18, 1919, inclusive.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

D. The amount of the net income, if any, or the deficit, if any, arising out of and from the operation of said Brooklyn City property, during said period.

E. If a deficit, as to the liability of the Brooklyn City R. R. Co. for such deficit.

F. (a) As to the amounts paid by the receiver of Brooklyn Heights R. R. Co. to the receiver of Brooklyn Rapid Transit Co. for power furnished and maintenance and repair work done prior to July 14, 1919; (b) and also all other payments made prior to September 22, 1919, by the receiver of Brooklyn Heights R. R. Co. to the receiver of Brooklyn Rapid Transit Company.

G. As to what part of said sum or sums so paid was derived from the receipts from the operation of said Brooklyn City property July 14 to October 18, 1919.

H. As to the propriety of such payments.

I. As to the amount and nature of the unpaid obligations of the receiver of Brooklyn Heights R. R. Co. in respect of said period, July 14 to October 18, 1919.

J. As to what disposition should be made by the receiver of Brooklyn Heights R. R. Co. of the cash on hand.

K. The issues raised by paragraphs 23 and 24 of the answer of Brooklyn City R. R. Co. to application No. 79—on which this order 79A was made. The issues raised by these paragraphs are:

(1) That for some time prior to December 31, 1918, the Brooklyn Heights R. R. Co. had made large loans to the Brooklyn Rapid Transit Co. which were due and payable on December 31, 1918, and which far exceeded any amounts owed by Brooklyn Heights R. R. Co. to Brooklyn Rapid Transit Co. for power and maintenance furnished thereto.

(2) That subsequent to December 31, 1918, while Lindley M. Garrison was receiver of Brooklyn Rapid Transit Co., and as such in control of its subsidiary companies (including Brooklyn Heights R. R. Co.), said Brooklyn Heights R. R. Co. purported to pay to said receiver of Brooklyn Rapid Transit Co. certain sums of money (amount unknown to defendant), which amounts the said receiver of Brooklyn Rapid Transit Co. applied on account of power and maintenance furnished prior to December 31, 1918.

(3) That if said receiver of Brooklyn Rapid Transit Co. had applied the amounts so received to the payment of power and maintenance furnished by him since his appointment as such receiver, the amounts owing him for power and maintenance on July 14, 1919, would have been very largely reduced if not entirely liquidated.

L. All other issues raised by the answer of the Brooklyn City Railroad Company to said application No. 79.

By the order dated July 2, 1920. No. 47B, there were also referred to the special master, with instructions to take proof and report his conclusions, certain additional issues as follows:

M. Whether or not the claims of the receiver of Brooklyn Rapid Transit Co. for amounts unpaid for electric current furnished and maintenance and repair work done in connection with operation of the lies and railroads and other properties of the Brooklyn City R. R. Co. prior to the date of delivery of possession under the order of October 16, 1919, constitute or may lawfully be declared to be a lien on the property of Brooklyn City R. R. Co. or any of it.

N. If it be such lien, is the same prior in lien or superior in equity to the liens of any or all the following mortgages:

(1) First consolidated mortgage of Brooklyn City R. R. Co. to Kings County Trust Company, dated June 1, 1891.

(2) Refunding mortgage of Brooklyn City R. R. Co. to Long Island Loan & Trust Company dated August 1, 1906.

### Preliminary Statement.

By lease dated February 14, 1893, the Brooklyn City leased its railroad and other property to the Brooklyn Heights R. R. for a term of 999 years. This property comprised about 50 per cent. of the street surface railroads in Brooklyn. Since about 1898 the Brooklyn Rapid Transit Company owned all

the stock of the B. Heights and the two companies had officers, directors, and offices in common. The same is true as to various other surface railroads and as to elevated and subway lines in Brooklyn.

On December 31, 1918, Mr. Garrison was appointed receiver of B. R. T. He continued in office the various officers who had been officers of B. R. T. and of the subsidiary companies. On July 14, 1919, Mr. Garrison was appointed receiver of B. Heights and entered into possession of the property covered by the lease. Thereafter, pending a determination as to whether or not the receiver would adopt the lease from the City Company, the receiver maintained and operated said property. Having reached the conclusion that he should not adopt the lease, he applied to the court, on September 23, 1919, for instructions, and on October 18, 1919, in compliance with such instructions, having disaffirmed the lease, he returned the property covered thereby to the City Company.

Upon these facts and others, which appear in the record (to such of which as seem material reference will hereinafter be made) the above questions were formulated. They may now be discussed, but not in the order of their enumeration.

Question A: Whether such operation of the property covered by the lease was for account of the lessor. during the period from July 14 to October 18.

Question B: What is the legal responsibility of said receiver to said Brooklyn City R. R. Co. in this regard?

Question E: Whether in the event of a deficit resulting from such operation, the City Company is liable for such deficit.

These questions seem to be settled for the federal courts in the Second Circuit by decisions of the Circuit Court of Appeals. The first of these is Penn. Steel Co. v. N. Y. City Railway Co., 198 Fed. 725, 117 C. C. A. 503, referred to as the "Termination of the Lease Proceeding." The railroad property of the Metropolitan Street Railway Company had been leased to the N. Y. City Railway Co. Receivers of the latter company had been appointed. who took possession of all the property covered by the lease, maintained and operated it for about 10 months, and then disaffirmed the lease. The proceedings were concerned with the rights, duties, and obligations resulting from this experimental operation. Two questions were presented: First. what was the extent in time of the period during which the receiver operated the property for account of the lessor? Second, what were the principles which should govern receiver's accounting for such operation?

As to the first of these propositions, the court held that the period began on the day the receiver entered into possession. Subsequently (in the case next hereinafter referred to) they explained that this decision was induced by the peculiar situation presented in the Termination of the Lease Proceeding and did not apply generally where the facts were different. This later decision, however, in no way qualified so much of the earlier decision as dealt with rights, duties, and obligations arising during the period when the operation by the receiver was on account of the lessor. For that reason, and because it discusses these rights, duties, and obligations very fully, and because such discussion indicates quite clearly by what underlying principles some of the issues here presented are to be determined, the following excerpts from the opinion of C. C. A. are set forth in extenso:

"When a court of chancery appoints a receiver of the property of a railroad company which embraces a leasehold estate, it is his duty to take possession of it, but he does not by such act become assignee of the term. He does not stand in the shoes of the lessee and is under no obligation to adopt its contracts. * * * If a receiver elect to adopt a lease, he becomes vested with the title to the leasehold interest, and a privity of estate is thereby created between the lessor and him, by which he becomes liable upon the covenant to pay rent. * * * But unless and until he does adopt a lease, there is no such privity and no liability upon the lease. He holds possession, not as a trespasser, but rather as a licensee, for the purpose of determining what disposition to make of the leasehold estate. The rule is well settled that a receiver in taking possession of a leased road is entitled to a reason-

able time in which to decide whether the interests of his trust will be better subserved by making the lease his own or by returning the property to the lessor. * * *

"This rule grows out of the necessities of the case and is not inequitable toward the lessor. The contract of lease is not necessarily affected by the appointment of the receiver. The right of the lessor to enter for condition broken is not impaired. It may stand upon its legal rights. But ordinarily it is not in a position to stand upon them. A lessor railroad company is seldom so situated that it can take back its property immediately upon the appointment of a receiver for its lessee. It may have no working organization. Its rolling stock may have become worn out. It may have insufficient immediate funds. Its public duties, however, must be performed without interruption. It is a quasi public corporation, and must keep its railroad going. Its franchises must be preserved. Its obligations as a common carrier must be fulfilled. And these obligations can seldom be fulfilled, except by the temporary operation of the leased road by the receiver of the lessee. A court of equity in provisionally operating a leased line confers a benefit upon the lessor company as well as upon the lessee. * * *

"A receiver of a lessee corporation, by provisionally operating a leased road, does not thereby become bound to pay rent for the trial period at the rate stipulated in the lease in case he elect to renounce it. In the absence of special equities, he does his full duty when he turns over to the lessor the entire net earnings of the road. * * * While the reason for the rule that the receiver is bound to account only for net earnings is not always stated in the authorities, it is clear that it must be based upon the lessor's acquiescence. As we have seen, the lease in no way governs the relations between the receiver and the lessor. The receiver for the time being is operating the property of almost a stranger corporation for, to a large extent, its benefit. The corporation is willing that he should so act. If, then, he turn over the entire net earnings of the road, it is not apparent upon what equitable principles the acquiescing lessor can demand more. If the lessor does not acquiesce—if it knock at the door of the court and demand back its property—it is in a position to demand the stipulated rental. * * * But, if it do nothing, it is not unfair that it should take what its property earns and no more.

"But this does not cover the contingency where there are no net earnings and the leased road is operated by the receiver at an actual loss. There is a difference between giving a lessor corporation that which its road earns and making it pay a deficiency. And yet we think that the difference is not one of principle. If a lessor assent to the performance of its public duties by the receiver of the lessee, it should take the results as they come. Its franchises are the ones which are preserved by the continued operation. It is essential to it that operations should go on. The same principles which give the acquiescing lessor net earnings, instead of rentals, make it liable for deficiencies when there are no net earnings. In other words, we think that the receiver must be considered as operating the leased road for the account of the lessor.

"It is not necessary in order to hold a lessor corporation, which acquiesces in the operation of its road by the receiver of the lessee responsible for losses in operation that it should expressly promise to pay for them. The law would imply a promise in such circumstances. A lessor corporation may demand the return of its property. It is free to take the benefit of, or reject, a receiver's services. If it accepts them, there is an implied promise to meet the necessary consequences of them."

The same Circuit Court of Appeals held in Penn. Steel Co. v. N. Y. City Railway Co., 216 Fed. 471, 132 C. C. A. 518, affirming the Circuit Court in 208 Fed. 182, that by reason of the peculiar nature of property owned by these quasi public corporations, the cost of operating their roads for a brief period prior to receivership constituted a preferential claim, which would displace a mortgage lien. Upon the same principle a deficit of this sort caused by temporary operation of a railroad in a time of disaster, when such operation was essential to the preservation of the franchises upon which in part the mortgage is bottomed might be held a preferential claim.

The case, in which the same Circuit Court of Appeals qualified its former decision as to when a period of occupancy on lessor's behalf would begin, is Penn. Steel Co. v. N. Y. City Railway, 225 Fed. 737, 141 C. C. A. 6, referred to as "Second Avenue Use and Occupation Proceeding." The Second Avenue had leased its property to the Metropolitan in 1898, which latter company leased all its property, including this leasehold, to the N. Y. City Railway Company. Receivers of the N. Y. City and of the Metropolitan had been appointed in the fall of 1907. The rent stipulated in the Second Avenue lease was a percentage on its capital stock, interest on its bonded indebtedness together with all taxes, assessments, and lawful charges imposed on the demised premises. The receivers entered promptly into possession of the property, but, "though not adopting the lease, no doubt to prevent any reclamation by the lessor, did pay the Second Avenue company sums equal to the stipulated rent" as the various installments thereof came due. On May 31, however, they declined to pay the moneys necessary to make up the full amount due for that quarter. On October 9, 1908, a receiver in foreclosure of the Second Avenue mortgage was appointed, and at midnight between November 12 and 13 the other receivers surrendered the road to him.

The Circuit Court of Appeals said: "If receivers do not pay the stipulated rent of a leased road, the lessor may ask the court that they return it, and in view of this fact a receiver who had not adopted the lease, but wishes to remain in possession, may prefer to pay as the value of the use and occupation a sum equal to the stipulated rent, though under no greater duty than to pay the net earnings of operation. * * * So long as the Second Avenue Company was receiving sums equal to the stipulated rent, it naturally would not, and indeed could not, demand a return of its premises." The court held that receivers were to be charged with net earnings only from June 1 to November 13, 1908.

The rental called for in the lease of B. City to B. Heights is as follows: The word "rental" is used in this opinion as covering all payments called for as compensation for the possession and use of the property, whether any particular item be so-called rent, or interest on lessor's bonds, or taxes imposed upon it. By article XIV the lessee agrees to pay to the lessor:

(1) An annual rental at the rate of 10 per cent. upon the capital stock of the lessor from time to time outstanding not in excess of $12,000,000, such rental to be paid quarterly on the 1st days of July, October, January, and April in each and every year.

(2) Also the interest on the bonded debt of the lessor upon bonds issued or assumed by it, at any time outstanding, not in excess of $6,925,000. Such payments to be made to the lessor at least five days before the semiannual interest shall become due and payable. This clause covers bonds issued in renewal or extension or for redemption of original bonds.

(3) Also within a reasonable time after the same shall have become due any and all taxes, assessments, license fees, car licenses, water rents, charges, and impositions. The lessee is given the right to contest the validity thereof, the time occupied in such contest not to be deemed a part of such reasonable time.

(4) Also all reasonable expenses of keeping up the organization of the lessor and to furnish suitable offices, etc.

(5) Also all rentals thereafter accruing under the terms of any agreement or lease then existing between the lessor and any one for the use of railroad tracks or real estate.

(6) By article XLII, it is provided that to entitle lessor to re-entry there must be default in payment of rental continuing for 60 days after demand of performance.

After taking possession of the premises covered by the lease on July 14, 1919, the B. Heights receiver made the following payments: On July 28, $18,-500, equivalent to the interest due August 1 on refunding 4 per cent. bonds of the B. City. On August 2, $500 and $76, equivalent of what had theretofore been paid for keeping up lessor's organization and for rent of its offices. On September 5, similar amounts, $500 and $76, for the like purposes. On August 1, 1919, installment of gross earnings tax $87,476.93 became due, which re-

ceiver did not pay on the due date, but he obtained extensions to pay the same from the state comptroller, said extensions being to October 1, 1919. On July 25, 1919, the receiver paid car licenses for the current year $15,720, which had come due on June 1, 1919. He paid the monthly installments of "bridge tolls" as they came due during receivership, aggregating $11,384.14.

The following tax items included in Exhibit BC 106 come within the classification of "rental":

| | |
|---|---:|
| Special franchise | $59,095.64 |
| Land | 17,918.20 |
| Improvements on land | 19,017.02 |
| Corporate real property | 3,231.33 |
| | $99,262.19 |

None of these became due until November 1, 1919, so naturally the receiver did not pay them. On September 15, 1919, there came up the question of paying the third installment of federal income tax $46,034.32. This was a prereceivership indebtedness; the full amount of the federal tax on income for 1918 (four times the above amount) becoming due March 15, 1919. On September 15, 1919, the receiver of B. Heights notified the lessor that he would not pay this installment of income tax. Down to this date the receiver had continued to pay, as indicated by the Circuit Court of Appeals, in the Second Avenue Use and Occupation Proceeding, sums of money equal in amount to all items of rental, which "became due" during his possession of the property.

Included in Exhibit BC 121 there are other taxes enumerated, all accruing as obligations prior to July 14, 1919. These were prereceivership indebtedness, which he would be under no obligation to pay, unless he assumed the lease. They would, of course, be items in the damages assessable to B. City Company upon a claim for damages against B. Heights Company for breach of lease. They were not items of "rental falling due" during the period of receiver's experimental occupancy.

It may be noted that a payment of $300,000 on July 1, 1919, by lessee to lessor was applied by the former, without objection by the latter, on account of the proportionate part of the "rental at the rate of 10 per cent. upon the capital stock" coming due on that date, instead of to the liquidation of prior unpaid taxes.

Apparently this refusal to pay the $46,034.32 installment of federal income tax indicated to the lessor that there was a strong probability that the lease and all obligations under it would not be assumed by receiver. The lessor itself paid the money to the collector of internal revenue and on September 18 demanded repayment. On September 25, it served a demand upon the receiver for return of the property unless certain franchise and real estate taxes were paid on or before September 29. It seems unnecessary to rehearse what occurred at that hearing. The District Judge is already fully informed. The final result was that the lease was disaffirmed as of October 1, 1919, and receiver ordered to return the property at midnight between October 18 and October 19.

The conclusion is reached that during the whole period from July 14, when he took possession, until October 1, when the lease was disaffirmed, the receiver duly paid sums of money equal in amount to all installments of rental which became due in that period except the state gross earnings tax, $87,476.93, payment of which had been extended by the state comptroller to October 1.

Following the rule laid down in Second Avenue Use and Occupation opinion of the Circuit Court of Appeals, supra, the conclusion is reached that it was only from October 1, to October 18, inclusive, that the receiver occupied and operated the property for account of lessor, with the obligation to turn over to the lessor the entire net earnings of the property during that period.

To question A, therefore, the answer is that the period of operation for account of the lessor was from October 1 to October 18.

To question B, the answer is that during that period the obligation of the receiver is to turn over the net earnings of the road during such period.

To question E, confining the same to the period of operation for account of the lessor, the answer is "Yes."

Counsel for B. City interests contend that the period of operation for account of lessor extends from July 14 to October 18. Therefore, in order that the whole situation may be presented to the court, accounts will be stated, when questions C and D come to be answered, separately as to each period. It may be noted here that counsel for B. Heights receiver refer in their brief to article XXXIX of the lease, by which the lessee covenants that, in the event of the termination of the lease by breach, default, or omission on its part, the "guarantee fund" or any balance thereof, shall at once become the sole and absolute property of the lessor, not by way of penalty, but as liquidated and stipulated damages.

In a proceeding by lessor to recover damages against lessee for breach of lease, this article might have an important bearing. It is thought, however, that it does not apply to the present proceeding, which is concerned with the receiver's occupation and operation of the property of which, as an officer of the court, he obtained possession. The rule is well-settled that his accounting is to be for net earnings during his occupancy; there is no claim against him for any penalty or for damages, liquidated or unliquidated, for breach of lease.

The briefs submitted on behalf of Brooklyn City R. R. interests seem not always to note the distinction between the obligations of a lessee to respond in damages for breaches of his covenants and the obligations of an officer of the court to account for his occupation and use of property during the experimental period and also during the subsequent period, after disaffirmance, when the lessor was getting ready physically to operate the road.

H. As to the propriety of payments made by B. Heights receiver to B. R. T. receiver for power and maintenance and repair·work furnished prior to July 14:

When B. R. T. receiver was appointed, on December 31, 1918, various street surface railroads (including the B. Heights and the Nassau) were indebted to B. R. T. for power, maintenance, and repair work furnished and done during the four months immediately prior to his appointment. By stock ownership and interlocking officers and directorates the B. R. T. controlled those companies. From the date of the appointment of B. R. T. receiver he continued to furnish all these companies with power, etc. From time to time such companies paid various sums of money on account of power, maintenance, and repair (and some other items), such payments being applied as made to the earliest unpaid items. When a receiver was appointed for each of these surface roads, he continued in like manner to pay the past-due bills accruing within the four months period prior to his appointment. Question was made as to the propriety of all such payments in the case of the Nassau Electric R. R. The special master's report thereon will be found in Vol. III of Proceedings, p. 663.

Although by stock ownership and interlocking officers and directorates, one railroad corporation may control another, the two are distinct legal entities, each owning its own property, obligated by its own contracts, and having its own creditors secured and unsecured. A receiver of such a corporation represents all interests. If its creditors insist that he shall collect debts due it from another corporation (represented it may be by another receiver appointed by another court) by threatening in the event of nonpayment to supply the debtor company with no more of the same things for which it is already indebted, he should heed their requests, even though the result may be unfortunate for the debtor company and for those interested therein. It was further thought, and so stated in the opinion, that this proposition was not negatived by the circumstance that the same individual happens to be receiver of both companies. Such. an accidental circumstance does not make their otherwise conflicting interests unitary.

This report in the Nassau Case came before the District Judge and was by

him confirmed. Appeal was taken from his decision to the Circuit Court of Appeals on April 3, 1921. In the present case the point is raised that a certain demand loan owed by B. R. T. to Brooklyn Heights should have been availed of as an equitable set-off to the B. R. T.'s claim for unpaid power bills. The same point was raised in the Nassau Case. The special master did not discuss it, because, as he construed the order referring that case to him, he was not commissioned so to do. The point, however, was in the Nassau Case when the master's report came before the District Court, was there argued, and was not sustained, since (except as to some minor matters) the master's holding as to the propriety of the Nassau's receiver paying these prior receivership bills was sustained. Appeal has now taken this point, with others, to the Circuit Court of Appeals, where presumably it will be disposed of when the appeal is reached for argument. It seems inappropriate for a special master himself to discuss this particular point now pending in the Circuit Court of Appeals.

The answer to question F, infra, shows that in the total of prereceivership bills paid by B. Heights receiver to B. R. T. receiver, $695,481.85, there was included $32,834.32 for construction. The District Court in the Nassau Case held that such an item as this did not come within the "four months" rule.

According to the books of the Brooklyn Heights Railroad Company (Exhibit BC), there was on July 14, 1919, an unexpended balance of $55,797.31 out of the $858,000 paid by the Brooklyn City Railroad Company in 1913 hereinafter referred to in answer to question G. The said $32,834.32, as paid from time to time by the receiver, was charged against said balance as being a proper use of the funds in said account.

The special master, in answer to question J, infra, has reached the conclusion that the uninvested proceeds of the said $858,000 constituted so-called "free cash" and that the Equitable Trust Company of New York as trustee had no equity in said fund. The exact balance in this fund, if any, is to be considered in the supplemental report referred to in the answer herein to question G. If, contrary to the view of the special master, it should be held that the $858,000 was impressed with a trust, and assuming a balance equal to $32,834.32 in said account, the special master concludes that under such a determination the said amount of $32,834.32 was a proper payment out of said $858,000, and not an improper application of general cash to the payment of bills not entitled to priority.

However, according to the view the Special Master takes of the case in this report, the payment of this sum of $32,834.32 will be treated as improperly made and should be repaid by the Brooklyn Rapid Transit receiver to the Brooklyn Heights receiver. Had the B. Heights receiver not used this $32,834.32 in paying for prereceivership "construction" he would have used it to meet his most pressing current obligations, to wit, current bills for power, maintenance, and repair work. Inasmuch as some of those bills are still unpaid he should, upon receipt of it, now apply it towards their payment. The answer to question I, infra, indicates that there is still unpaid to B. R. T. receiver, for power, maintenance, and repair work supplied subsequent to July 14, $328,584.47. If the $32,834.32 be so applied that amount will be reduced to $295,750.15.

All other payments inquired about in question H were proper, under the ruling in the Nassau Electric R. R. Case.

Question F: As to the amounts paid by receiver of B. Heights to receiver of B. R. T. for power, maintenance and repair work, furnished and done prior to July 14, 1919; also all other payments made prior to September 22, 1919, by receiver B. Heights to receiver B. R. T.

It is understood that the last half of this question F refers to payments made to B. R. T. receiver on account of obligations incurred by B. Heights prior to appointment of B. Heights receiver. Why the date September 22, 1919, is incorporated in the question the special master does not understand, and nothing is found in the testimony to indicate why that date appears. This report, therefore, in response to question F, states the entire amount

paid at any time by receiver B. Heights to B. R. T. receiver on account of prereceivership bills. The amounts due on July 14, 1919, were:

| | |
|---|---|
| Power, maintenance, and repair work | $602,571.61 |
| Administration, welfare work, insurance premiums etc. | 60,075.92 |
| Construction | 32,834.32 |
| | $695,481.85 |

The payments by B. Heights receiver to B. R. T. receiver on account of these obligations were:

| | |
|---|---|
| Power, maintenance, and repair work | $602,571.61 |
| Administration, etc. | 60,075.92 |
| Construction | 32,834.32 |
| Total | $695,481.85 |

It thus appears that the entire amount of prereceivership obligations to B. R. T. receiver inquired about in this question were paid in full.

G. As to what part of said sum or sums (the total paid to B. R. T. receiver on prereceivership obligations) was derived from receipts of B. City property from July 14 to October 18, 1919?

To answer question G it will be necessary, first, to consider the disposition actually made by B. Heights receiver of cash on hand at the date of his appointment. The total of this was $587,677.19. The books and records, however, informed him that portions of this amount were specifically earmarked.

(1) There was money which had been deposited by the employees and held to redeem badges and punches for the employees of the entire B. R. T. system. This amounted to $27,830.

(2) There was also $3,401.99 representing the conductors' fidelity fund.

(3) There was money which represented the proceeds of sale of real estate, etc., of B. City, which property was covered by B. Heights certificates of indebtedness. It might be expected that question would be raised as to whether or not these moneys were impressed with a trust for the benefit of the holders of these certificates. This amounted to $253,144.83.

(4) There was a payment by B. City with respect to the real estate at Madison and Traffic streets, originally acquired out of $858,000 paid by Brooklyn City in 1913 in settlement of a suit under the lease. The circumstances under which this payment was made were such that it might be anticipated that question might be raised as to whether this amount was impressed with a trust. This item amounted to $23,554.90.

(5) There was a further amount of $55,797.31, which was carried on the books of the Brooklyn Heights R. R. Company as a credit in the account known as "Brooklyn City Construction Account," purporting to represent the unexpended balance of said $858,000. To determine whether this amount should be deemed a cash credit, representing an equivalent amount of cash in the possession of the receiver, or whether said amount of cash should be considered as part of the general funds of the company, or, in the event that the said amount is properly carried as a cash credit balance in said account, to determine whether the said cash is free cash available for any proper use by the receiver, or, on the contrary, is impressed with a trust will require careful consideration of the construction account to the extent of the transactions resulting in said credit balance, a statement whereof is now in process of preparation. The special master will render a supplemental report on this matter and for the time being does not herein determine the question as to whether or not said item of $55,797.31 is or is not free cash, but for the purposes of this report and until such determination, will treat the said amount as if it were not so-called free cash.

The receiver treated all these amounts as cash which he was not free to dispose of for general purposes, and therefore did not use any part of them to pay prereceivership obligations to B. R. T. receiver, except the item of $32,834.32 for construction work referred to in the answer to question H,

supra. In view of the circumstances, the receiver was fully warranted in keeping these five items segregated until it were determined by the court, after notice to all who might be interested, whether or not they were trust funds. The total of these five items is $363,729.03. Withdrawing this amount from the total cash on hand, $587,677.19, there was left in receiver's hands $223,948.16.

Subsequent to his appointment B. Heights receiver realized on various assets of the B. Heights Company to October 31, 1919, $166,748, of which amount $4,296.55 represented proceeds derived from the salvage of property disposed of and written out of the Brooklyn City construction account and the balance of $162,451.45 became cash available to pay any obligations. The aggregate of these two sums is $386,399.61. Deducting this amount from the total payments to B. R. T. receiver on account of prereceivership obligations for power, maintenance, repair work, welfare expenses, etc., exclusive of construction bills amounting to $32,834.32, referred to supra in answer to question H ($662,647.53) the difference is $276,247.92.

The answer, therefore, to question G is that of the sums found to have been paid B. R. T. receiver by B. Heights receiver in payment of prereceivership debts, in answer to question F, viz. $695,481.85, there was paid from receipts from the operation of B. City property between July 14 and October 18, $276,247.92.

Question I. As to the amount and nature of the unpaid obligations of the receiver of B. Heights R. R. Co. in respect of such period, July 14 to October 18. The items of these obligations incurred are:

| | |
|---|---|
| (1) Power and maintenance and repair work | $1,041,004.56 |
| (2) Administration, welfare work, insurance premiums, etc. | 74,893.08 |
| (3) Construction | 23,218.04 |
| (4) Construction in respect to 469 cars | 64,275.73 |
| Total | $1,203,391.41 |

Payments have been made on account of these obligations (including an item of $300,000 in April, 1921), as follows:

| | |
|---|---|
| (1) Power, maintenance and repair work | $712,420.09 |
| (2) Administration, welfare work, insurance premiums, etc. | 29,922.03 |
| (3) Construction | 21,249.08 |
| (4) Construction in respect to 469 cars | 34,539.89 |
| Total | $798,131.09 |

This leaves the amount of these obligations still unpaid, as follows:

| | |
|---|---|
| (1) Power, maintenance, and repair work | $328,584.47 |
| (2) Administration, welfare work, insurance premiums, etc. | 44,971.05 |
| (3) Construction | 1,968.96 |
| (4) Construction in respect to 469 cars | 29,735.84 |
| Total | $405,260.32 |

If, as indicated in the reply to question H, the sum of $32,834.32, improperly paid by B. Heights receiver to receiver B. R. T. for prereceivership construction, is returned to him, and by him paid to B. R. T. receiver on account of power, maintenance, and repair work supplied subsequent to July 14, 1919, the first of the above items will be reduced from $328,584.47 to $295,750.15, and the total from $405,260.32 to $372,426.

Question J. As to what disposition should be made by the receiver of Brooklyn Heights R. R. Co. of the cash on hand:

This question was framed nearly a year ago. The court probably had in mind the cash in hand on July 31, 1920; since the hearing occupied so much time, Exhibit BC 126 enumerates the cash in hand at close of business April 30, 1921. The total is $676,461.19. The only items that call for consideration

are enumerated in Exhibit BC 127, "Analysis of cash on hand, April 30, 1921," furnished by the accountants, as follows:

To redeem badges and punches ...............................$29,390.00
Conductors' fidelity fund ..................................  2,040.14

No one disputes the proposition that deposits for badges and punches and moneys in the conductors' fidelity fund are in the nature of trust accounts. As to certain other items the facts are as follows:

Certain land and structures described in certificate of indebtedness No. 158 of Brooklyn Heights R. R. Company were acquired by the B. Heights Company from the Transit Development Company, and the said certificate was given by the B. Heights to Transit Development Company in payment therefor. The certificate contains the following: "It is agreed between the holder of this certificate and the Brooklyn Heights Railroad Company that all of the property described in this certificate shall be held in trust by the said the Brooklyn Heights Railroad Company." Also the following: * * * "When and as any or all of said property shall be sold, the proceeds thereof from time to time will be applied by said the Brooklyn Heights Railroad Company, at its option, either to the payment of this certificate of indebtedness or to the purchase or improvement of other property which shall be held by said company in trust for the payment of this certificate, and a schedule thereof shall be forthwith furnished to the holder of this certificate."

This certificate of indebtedness, and others like it, were pledged and deposited by Brooklyn Rapid Transit Co. with Central Union Trust Company, as trustee under the first refunding and gold mortgage of Brooklyn Rapid Transit Company, against the authentication and delivery of bonds under section 5 of article 1 of said mortgage. The following items of cash on hand represent the proceeds of property covered by this certificate of indebtedness and so sold:

| Date Paid. | Item. | Amount. |
|---|---|---|
| Dec.  2, 1918. | Real Estate Fresh Pond road...................... | $ 21.432.75 |
| June 18, 1919. | Additional property Fresh Pond road............. | 68,675.00 |
| June 27, 1919. | Improvements Fresh Pond road property.......... | 48,947.79 |
| July 10, 1919. | Ditto ......................................... | 100,394.80 |
| Nov.  5, 1919. | Ditto ......................................... | 69,500.00 |
| Mar. 11, 1920. | Ditto ......................................... | 8,796.07 |
| | | $317,746.41 |

Except for the circumstance that the certificates of indebtedness covering the property bear different numbers, the situation in reference to the following item is the same:

| Date Paid. | Item. | Amount. |
|---|---|---|
| July 10, 1919. | Line and track department building .............. | $13,694.49 |

The aggregate of these items covered by certificates of indebtedness as before described is $331,440.90. It is thought that there is no dispute that whatever lien there was created against these several parcels of real estate adhered to the proceeds of their sale. It is, however, contended that as to the disposition of these proceeds the B. City Company has a superior equity. For reasons stated in answer to Question N, that contention is not here discussed. . It may be taken up in a supplemental report, if the court so desires.

With regard to two other items, $23,554.90 and $923.29, aggregating $24,-478.19, the situation is as follows: They represent uninvested proceeds of a payment of $858.000 made by the Brooklyn City Railroad Company in settlement of a suit under the lease to B. Heights, dated February 14, 1893. The lease is printed in volume II, Exhibits, p. 1183. The suit was brought by B. Heights to recover an alleged underpayment by B. City under the provisions of article V. That article required the B. City to issue and sell $3.000,-000 stock and $3,000,000 bonds and to use the proceeds in payment, at the re-

quest of the lessee from time to time, of the cost of converting the railroads of the lessor into an electric railroad or any other kind of railroad authorized by law and/or in payment of such additions, improvements, extensions, branches, and equipments to the said railroads and property of the lessor, other than those necessary to keep the same in good condition and repair.

Contention is made by the Equitable Trust Company, successor trustee under first mortgage of B. R. T., dated October 1, 1895, that it has an equity of some sort in these two sums of money. In view of the decision of the Circuit Court of Appeals in the Sea Beach Bonds Proceeding, 263 Fed. 532, construing the after-acquired property clause in said mortgage, this contention is not sustained. The conclusion is reached that both these items are "free cash." The first item ($23,554.90) was part of the cash taken over by B. Heights receiver upon his appointment, but not used by him for reasons set forth in answer to question G. Had receiver known at the time that this $23,554.90 was free cash, he would presumably have used it to pay his most pressing current obligations, to wit, current obligations for power, maintenance and repair work. Inasmuch as some of those bills are still unpaid, it would seem proper that he should now pay this sum, and the $923.29 collected in March, 1920, on account thereof.

With respect to an additional item of $49,327.79 (Exhibit BC 127), the determination of whether this item represents free cash or is impressed with some trust or lien involves a consideration of the same or a similar question as that referred to in paragraph 5 under question G, and the special master will report thereon in the supplemental report referred to under question G. In the meantime, and for the purposes of answering question J now under consideration, this item will be treated as not constituting free cash.

The remaining item in Exhibit BC 127, amounting to $239,784.17, other than those here discussed, which make up the total of $676.461.19, is found to be "free cash," which receiver may apply as his necessities may require.

Question K. The issues raised by paragraphs 23 and 24 of the answer of Brooklyn City R. R. Co. to application No. 79—on which this order was made.

Question L. All other issues raised by the answer of the Brooklyn City Railroad Company to said application.

It is thought these questions are substantially answered, in the answers (supra) to question F, G, and H. It therefore seems sufficient to state here that, prior to December 31, 1918, the B. Heights Company had loaned to B. R. T. the sum of $975,000 on demand notes. On December 31, 1918, there was owing from B. Heights to B. R. T. on certificates of indebtedness payable on demand the sum of $7,992,173.53, with interest thereon amounting to $239,-765.21. On December 31, 1918, there was due to B. R. T. for interest on its equity in B. City Construction Account $144,357.77. The accountants also refer to what they describe as "B. R. T. equity in B. City Construction Account, $5,380,476.79." It is understood that all questions relating to that subject are or will be presented in another proceeding, which has not been sent to the special master. For that reason no consideration has been given to any such questions.

Question M. Whether or not the claims of B. R. T. receiver for amounts unpaid for power, maintenance, and repair work done in connection with the operation of the lines, etc., of Brooklyn City R. R. prior to the date of delivery of possession on October 18, constitute or may lawfully be declared a lien on the property of B. City or any part of it?

The amounts unpaid will be found stated in the answer to question I. The items inquired about were obtained by B. Heights receiver upon credit. At the time they were obtained he was, in substance, as the court said in "Termination of the Lease Proceeding," 198 Fed., supra, a "licensee," "operating the property which he occupied for the benefit of the owner." The items were not furnished to him upon his personal credit, but on the credit of the property, which he was thus occupying and operating. All of the items enumerated as "(1) Power, maintenance, and repair work" were used solely to keep up the railroad of the owner as a going concern, thereby serving the

public and saving the owner's franchises from forfeiture; items such as these were absolutely essential for such purpose.

The group of items enumerated as "(2) Administration, welfare work, etc.," was held by this court in the Nassau Elec. R. R. Case to belong to the same class.

The group described as "(3) Construction," was not essential to the continued operation of the property as it existed on July 14, 1919; but such expenditures were for improvements and betterments of the property, which belonged to the owner and which its "licensee" was occupying and operating. Such improvements and betterments were obviously for the benefit of the owner, the value of its property has been thereby increased, and it now owns and possesses them. In the Nassau Case it was held that items such as this did not come within what is known as the "four months rule." But this question M is not at all concerned with the application of the four months rule; we have here no prereceivership obligations, merely current obligations incurred while the receiver of the lessee was occupying and operating the property for the account of the owner of the property.

The next group, however, "(4) Construction in respect to 469 cars," is of a different sort. The cars did not belong to the Brooklyn City, and any improvement or betterment did not accrue to it. The conclusion is reached that the B. R. T. receiver has no valid claim against the B. City company for the items in this group.

The total amount of groups 1, 2, and 3, as given in answer to question I, is $375,524.48. If the $32,834.32 referred to in that answer be deducted, the balance will be $342,690.16. The conclusion is reached that B. R. T. receiver has a valid claim against B. City company for that amount, which its licensee obtained upon its credit, but has not paid.

The B. R. T. receiver and the B. City Company are both, of their own motion, before the court in this controversy. Should an order be made finding the latter indebted to the former as submitted in the last preceding paragraph, such order will be, practically, a money judgment for that amount. Like all other money judgments, it will be a lien on the property of the B. City Company, to be collected as such judgments usually are by execution and sale of such property as may be subject to levy, or by creditor's bill.

Question N. If it be such lien, is the same prior in lien or superior in equity to the two mortgages of Brooklyn City Company in such question named, viz.: First consolidated mortgage to Kings County Trust Company, dated June 1, 1891, and refunding mortgage to Long Island Loan & Trust Co., dated August 1, 1906?

An affirmative answer to such question would involve the displacement of the liens of these mortgages. The respective mortgagees object that the court has no jurisdiction in this proceeding thus to displace those liens.

There is much force in this objection. Neither mortgage trustee nor any bondholder has come into court asking for the enforcement of mortgage liens; nor has any creditor's bill been filed against the property of the B. City Company, which is a going concern, apparently solvent, managing its own affairs, fulfilling its duties towards the public, and meeting all its just obligations. This court, acting through the receiver of Brooklyn Heights Company, a lessee, had temporary possession of the leasehold property until it might be determined whether such receiver would accept the lease, but it may be strongly contended that such possession is different from the possession it would have had of the corpus, had a receiver been appointed under creditor's bill or on mortgage foreclosure brought against the property of the B. City Company. Indeed, even if such receiver under creditor's bill had been appointed and entered into possession of the corpus, it might be questioned whether the court would have authority to displace mortgage liens until default by receiver in payment of mortgage interest (or principal) had brought the mortgage trustee into court asking for relief by foreclosure and sale.

It seems unwise now to enter into any argument as to the concrete question here presented. Part, at least, of the premises upon which argument would be based, are in dispute and about to be settled by controlling authority. The

contention that is made in support of an affirmative answer to this question N presupposes the existence of a claim of B. R. T. receiver for power, maintenance, etc., supplied subsequent to July 14, 1919. See the items in the answer to question I. The appeal in the Nassau Case, now before 'the Circuit Court of Appeals presents (as does this case) the question whether the payment by receiver to the B. R. T. receiver of prereceivership bills for power, maintenance, etc., was a proper one. Should the decision in the Nassau Case be that it was not, such would, no doubt, be followed in the present case. The result would be that the B. R. T. receiver would return to B. Heights receiver the amount thus improperly paid, found in the answer to questions H and F to be (including the $32,834.32) $695,481.85. Presumably the B. Heights receiver would thereupon pay to B. R. T. receiver the unpaid balances due for power, etc., supplied between July 14 and October 18, found in the answer to question I to be $405,260.32. As soon as such payment was made the major premise of the argument—a money judgment in favor of B. R. T. receiver against B. City for $375,524.48 or $342,690.16—would entirely disappear.

It is true that, in that event, the B. R. T. receiver might insist that he was entitled to judgment for the amount of lessee's prereceivership indebtedness of this character (expenses essential to preservation of lessor's property) against the lessor itself. But the two claims are for different things—one for prereceivership power, etc.; the other for postreceivership power, etc.— and the line of argument in support of the claim might be different, because in the one case there would be lessor and lessee, and in the other case the owner of the property and an agent put in possession of it, through operation of law, to occupy and operate it on account of the owner.

Should the court think it desirable, nevertheless, to discuss the question presented at this time, a supplemental report can be promptly submitted, as the evidence is all in and the briefs are quite full.

Question C. What amount, if any, the Brooklyn City R. R. Co. is entitled to receive or be credited with in respect of any moneys derived from the operation of said Brooklyn City property during said period from July 15, 1919, to October 18, 1919, inclusive.

Question D. The amount of net income, if any, or the deficit, if any, arising out of and from the operation of said Brooklyn City property during said period.

These questions are practically the same. Assuming the answers to questions A and B to be correct, accounting upon the basis of net income, or deficit, should cover only the period from October 1 to October 18, inclusive. This will be first discussed.

It may be noted that such accounting should be based upon accomplished facts rather than on estimates. The receiver of B. Heights for a certain period occupied the property of the B. City Co. and used it to obtain money by its operation. For every dollar thus received he is to account, but not— at least in this proceeding—for money he never received. In thus accounting he is entitled to credit himself for any money which he actually spent upon the property and for its operation, but not for money which he has not so spent.

Now, nearly all the tabulations marked as exhibits, which have been submitted by the accountants, are prepared "on an accrual basis." Quite naturally so, because the usual object of an accounting of the operations of a railroad is to ascertain whether the enterprise is profitable or not. It has not been always easy to draw off from these exhibits the items which make up actual income and actual expenditure. An illustration of the difference between the two methods of accounting is found in Exhibit BC 106, where the receiver is credited with $4,100.82 for payment of car licenses. This sum represents that amount of the entire yearly license fee which is proportionate to the period of occupancy. As a matter of fact the receiver paid car licenses for the entire year, a total of $15,720. Such payment has enabled the B. City Company, upon return of its road, to run the cars for many months without paying any further license fees, as it would have to do had this full yearly payment not been made by B. Heights receiver. In this accounting

the receiver is credited for the full amount of cash he actually paid out, $15,720.

It may well be that, in stating actual income and actual expenditure, with these exhibits as a basis, some errors have been made; but the items have been given in such detail that any errors, if such there be, may be corrected without sending the case back for further hearing. If it be thought desirable to have further tabulations made by the accountants illustrating the changes in original exhibits due to recasting by the special master, they may be put in evidence as part of the record after this report is filed with the same force and effect as if they had been introduced before the close of the hearing.

Taking up, then, first, the receipts from operation during the period from October 1 to October 18, we find from Exhibit BC 93 the following items:

| | |
|---|---:|
| Transportation revenue | $526,900.03 |
| Advertising and other privileges | 7,638.96 |
| Rent land and buildings | 2,475.62 |
| Rent equipment | 109.00 |
| Rent tracks and terminals | 902.03 |
| Operating gross receipts | $538,025.64 |

Other items are described as "Rent accrued from lease of road and equipment." They are:

| | |
|---|---:|
| Coney Island & G. R. R., four cars | $    43.55 |
| Receiver N. Y. Consol. R. R. Lutheran Cemetery line | 1,209.67 |
| | $1,253.22 |

These amounts have been collected by Heights receiver and should be added to the gross receipts. The same is true of an item described as "Other rent revenues, sundry tenants," $600.91. Another item is "Leasehold revenues, sundry tenants," $234.68. Of this amount $220.16 has been actually collected. Another item, described as "Trackage, receiver Nassau El. R. R. $1.303.29," was collected by Heights receiver in November, 1919. Adding all these items together, we have:

| | |
|---|---:|
| Operating gross receipts | $538,025.64 |
| Rent lease of road and equipment | 1,253.22 |
| Other rent revenues | 600.91 |
| Leasehold revenues | 220.16 |
| Trackage Nassau R. R. | 1,303.29 |
| Total receipts | $541,403.22 |

Taking up next the expenses, we find from the same exhibit the following: "Operating expenses, $466.202.44." Analysis of this amount shows that it consists of two separate items. The first is $229.012.29 for power, maintenance, etc., supplied by B. R. T. receiver. From that amount there should be deducted a small amount repaid on adjustment amounting to $1,363.96. This reduces the item to $227,648.33. The second item is for "other operating expenses" $237,190.15. That, however, includes a charge of $4,838.70 for "depreciation," required by sound bookkeeping and by regulations of the Public Service Commission. Since the receiver did not pay out this sum, he cannot include it among his expenditures. Deducting it, the item is reduced to $232,351.45. The sum of these two items, as thus corrected, $227,648.33, plus $232.351.45, is $459,999.78, as the total operating expenses.

From Exhibit BC 93 it further appears that the Heights receiver paid various small sums for trackage, rent of cars, etc., to the receivers of the Nassau, of the Coney Island & Brooklyn, and of the N. Y. Consolidated R. R., to the Coney Island & Gravesend Ry., to the South Brooklyn Ry., the Bridge Operating Co., and the N. Y. & Queens Elec. L. & P. Co. These aggregate $2.507.20. There is an item of charge for work on Fifty-Second street dock, $549.52. It further appears that the Heights receiver expended the sum of $9,725.15

after October 18, 1919, in payment of obligations incurred by him between October 1 and October 18, 1919, for improvements and betterments of the property which belonged to the lessor.

On October 6, 1920, the receiver paid $26,477.08, being an installment of state gross earnings tax which fell due August 1, 1920. Why he paid this particular tax does not quite clearly appear in the record; but it appears to be a tax which the lessor was obligated to pay, and the receiver's payment of it prevented the tax collector from levying it out of the property or assets of the lessor. It was a payment obviously for the benefit of the lessor actually paid by the receiver, and as such should be credited to the receiver. He further paid the sum of $2,225.50, being installments of "bridge tolls" as they came due during this period.

No one can run a railroad for any length of time without causing damage to others. The receiver should be credited with what he has paid to settle the claims for damages arising during this period of occupancy, October 1 to October 18. He should also be protected against having to make future payments to settle similar claims. No one seems to dispute these propositions. According to Exhibit BC 93, he has actually paid $15,613.43. It is estimated that he will have to pay for unsettled claims $9,620.46, and that the expense of settlement will be $1,500. The amount of these last two items are allowed to him as a credit, but should be held by him as a special fund, so that, if it turns out, when the last claim for damages incurred during this period shall have been paid, that the total is less than the estimated amount, the residuum may be returned to the lessor.

The next item is the proportionate amount due with respect to expenditures on the Brooklyn and Williamsburgh Bridges. No figures are given in BC 93, but both sides seem to be in accord as to the method for reaching the result. The expenditures are taken to be, in round numbers, $330,000. Ten per cent. thereof, $33,000, is the proportionate annual amount to be contributed by the B. City. For 18 days the proportionate amount is $1,627.74.

The next item is rental for the cars used in operating, said cars not being owned by the lessor. Both parties agree that such allowance should be made; but differ as to the amount of rental per car and as to the number of cars. The receiver contends that the allowance should be at the rate of $200,000 per annum for 469 cars. This would make the rate per day, for the whole 469, $547.94, and per day for each car about $1.17. The Brooklyn City contends that the rate for 469 cars should be $100,000 per annum.

After October 18, when the road was turned over to lessor and it started to operate, it was allowed to use the cars until some final arrangement could be arrived at whereby it might obtain cars, power, etc. While negotiations were going on it was arranged that the B. City should pay what it found itself able to pay. The object of every one concerned was to keep cars running, so that the public should not be inconvenienced. For this transition period, the B. City paid at the rate of $100,000 per year, and sought to have the same rate fixed in the permanent agreement. In that agreement, however, the price was fixed at $200,000 and agreed to by all. That circumstance, however, is not of much significance, because other matters in controversy were adjusted at the same time, and possibly the B. City was willing to pay a rate which it thought too high for the cars, because the same agreement was giving it something else at less than it seemed to be worth. The vice president and general manager of B. City testified that he thought $100,000 was a fair price. The chief engineer of the B. R. T. testified that he thought $400,000 was a reasonable price.

There is very little detailed in the evidence on which the special master could formulate an independent judgment as to the value. There are many things to be taken into consideration, as to which he is uninformed. The weight of evidence seems to be in favor of $200,000, and that rate is accepted and reported; $1.17 per car per day does not seem excessive. The number of cars, 469, is the total number belonging to the lessee or to B. R. T. on the lines or in the barns and repair shops. The vice president of the B. City testified that the property could have been operated with only 209 cars.

In an accounting of this sort there should not be an allowance for more than the number of cars which it seemed reasonably necessary to provide in order to operate the property. During the entire period from July 15 to October 18, 337 cars were actually used at one time or another. See testimony of Porter, N., page 173. It seems reasonable to conclude that only that number should be charged against receipts. We have, therefore, for the 18 days, 337x18x$1.17=$7,097.22, as a credit to receiver for cars provided.

It is also concluded that there should be some allowance for the expenses of the receivership. The same individual has been receiver for many of these roads, and in what proportions his expenses should be apportioned between them there is no evidence at all in this record upon which any opinion could be formed. No specific sum, therefore, is included in the tabulation for that item.

The aggregation of the other items is as follows:

Operating expenses ................................................$459,999.78
Paid for trackage, etc. ..........................................  2,507.20
Work on Fifty-Second street dock .................................    549.52
Construction .....................................................  9,725.15
State franchise tax .............................................. 26,477.08
Bridge tolls .....................................................  2,225.50
Damages paid ..................................................... 15,613.43
Damages unliquidated (estimate).................................. 11,120.46
Expenditures on bridges ..........................................  1,627.74
Allowance for cars ...............................................  7,097.22

Total expenses ...................................................$536,943.08

Since the total receipts have been found to be $541,403.22, the net income is $4,460.14. The answer to the questions C and D is therefore: Net receipts of operation due by lessee's receiver to lessor, $4,460.14. This sum, however, is subject to the lien of B. R. T. receiver as set forth in answers to questions M and I.

Exhibit BC 93 includes among the items of charge, without giving figures, "an equitable allowance in respect of amount due % property added to Brooklyn City plant by the Brooklyn Heights R. R. Co. and B. R. T. Co. respectively." It is understood that all questions relating to that subject are or will be presented in another proceeding which has not been sent to the special master. For that reason no consideration has been here given to any such questions.

Should the court reach a different conclusion from that above expressed in answer to questions A and B as to the period for which the lessee's receiver should account on the "use and occupation" basis, the following statement of account, covering the period from July 15 to October 18 inclusive is submitted:

### Period July 15 to October 18, 1919.

Taking up first the receipts from operation during the period we find from BC 52 the following items:

Total operating income ...........................................$2,601,623.57
Nonoperating income .............................................. 14,082.42
Rent tracks and terminals, Nassau ................................  1,303.29

Total receipts ...................................................$2,617,009.28

Taking up next the expenses we find from the same Exhibit the following: Operating expenses ...............................................$2,291,850.90

From Exhibit BC 52A, it appears that this consists of two separate items. The first is $1,115,897.64 for power, maintenance, etc., supplied by B. R. T. receiver. From this there should be deducted an allowance made on "power adjustments" of $3,929.71. This reduces the item to $1,111,967.93. The second item is for "other operating cost" $1,175,953.26. That, however, includes

a charge of $26,075.26 for "depreciation," required by sound bookkeeping and by regulations of the Public Service Commission. Since the receiver did not pay out this sum, he cannot include it among his expenditures. Deducting it, the item is reduced to $1,149,878. The sum of these two items as thus corrected, $1,111,967.93 plus $1,149,878, gives $2,261,845.93 as the total operating expenses.

It further appears that the receiver paid for hire of equipment $11,029.17; for track and terminal privileges, $3,022.75; and for miscellaneous items of the same nature, $1.50—an aggregate of $14,053.42. For charges at Fifty-Second street dock he paid $549.52. It further appears that the Heights receiver expended $21,249.08 after July 14, 1919, in payment of obligations incurred by him between July 14, 1919, and October 18, 1919, for improvements and betterments of property which belonged to the lessor. The damages actually paid and the estimated cost of settlement of those still unliquidated amount to $106,128.67.

On August 1, 1919, the receiver paid $18,500 for interest falling due that day on certain 4 per cent. bonds of Brooklyn City. On each of the dates, August 2 and September 5, 1919, respectively, the receiver paid $500 and $76, being the equivalent of amounts provided for in the lease for keeping up the lessor's organization and for rent of its offices. The aggregate of these payments is $1,152. On July 25, 1919, the receiver paid for car licenses the sum of $15,720. Testimony of Rudd, page 344. He further paid the sum of $11,384.14, being installments of "bridge tolls," as they came due during this period.

On October 6, 1920, the receiver paid $26,477.08, being an installment of state gross earnings tax, which fell due August 1, 1920. Why he paid this particular tax does not clearly appear in the record, but since it was a tax for which the lessor was liable, and since such payment has relieved lessor of any obligation to pay the tax collector, it is concluded that this sum is a proper item of credit to the receiver on this accounting.

The testimony recently taken shows that on April 11, 1921, the receiver paid B. R. T. receiver $300,000 in respect of the period of occupancy of the B. City property. He had paid from time to time other sums on like account aggregating $3,443.03. These items of $300,000 and $3,443.03 are not added into the column of expenses, because it is understood that they represent a part of the $1,111,967.93 for power, maintenance, etc., already included. The state of this account with the B. R. T. receiver will be found in the answer to questions F and I.

The next item is the proportionate amount due with respect to expenditures on the Brooklyn Bridges 96 days, $8,680.95. S. M. 206.

The item of rental for cars, calculated on the basis above indicated is: 337x96x$1.17=$37,851.84.

For reasons above stated there has been no attempt to figure out the proportionate part of receivership expenses, nor any "equitable allowance" in respect of property added to plant of B. City. The aggregation of the items above discussed is as follows:

| | |
|---|---:|
| Operating expenses | $2,261,845.93 |
| Hire of equipment, etc. | 14,053.42 |
| Dock at Fifty-Second street | 549.52 |
| Construction | 21,249.08 |
| Damages, paid and estimated | 106,128.67 |
| Interest paid on bonds | 18,500.00 |
| For organization and rent of lessor's offices | 1,152.00 |
| Car licenses | 15,720.00 |
| Bridge tolls | 11,384.14 |
| State earnings tax paid | 26,477.08 |
| Proportionate expense, bridges | 8,680.95 |
| Rental of cars | 37,851.84 |
| | $2,523,592.63 |

Since the total receipts have been found to be $2,617,009.28. the net income is $93,416.65. This sum, however, is subject to the lien of B. R. T. receiver as set forth in answer to questions M and I.

Carl M. Owen, of New York City (Lindley M. Garrison and Harold J. Gallagher, both of New York City, of counsel), for receiver.

Cullen & Dykman, of New York City (William N. Dykman, of New York City, of counsel), for Brooklyn City R. Co.

MAYER, Circuit Judge. In view of the elaborate report of the special master (hereinabove set forth), an extensive statement of facts is not necessary. At the outset it is important to bear in mind that two wholly separate matters are here for consideration as the result of combining the hearing of these matters for the purpose, mainly, of avoiding in some respects duplication of record.

The first matter arises under application No. 79, and the order of the court thereon, No. 79A. The main question in that proceeding is what, if any, accounting there should be between the Heights receiver and the Brooklyn City in respect of the operations by the Heights receiver of leased property between July 14, 1919, and October 18, 1919.

The second matter arises generally under application 47, which, in its relation to this reference, was an application by the B. R. T. receiver for an adjudication that his claim for unpaid power bills was a preferred claim against the assets of the Brooklyn City Co. This application subsequently led to order 47B, referring this claim of the B. R. T. receiver to the special master, to be investigated by him at the same time as he conducted his investigation of the questions under order No. 79A. Under order No. 47B, the question upon which the master reports is the liability, if any, of the Brooklyn City, the lessor to the B. R. T. receiver, for power, maintenance, and other services furnished by the B. R. T. receiver subsequent to July 14, 1919.

1. As preliminary to an understanding of the principal questions under consideration, it is vital to recall the situation on July 14, 1919, the date of the appointment of the Heights receiver. The B. R. T., which was then in receivership, had been furnishing power, maintenance, etc., through its receiver to the Heights Company and its leased line, the Brooklyn City Co. On July 14, 1919, Brooklyn City Co. had no cars, no operating organization, and in brief no means of operating or maintaining its lines, either immediately or for a considerable time to come. The lines of the Brooklyn City Co. were very extensive and comprised about 50 per cent. of the operated surface lines of the borough of Brooklyn. If the court had ordered the Heights receiver immediately to disaffirm the lease and return the property to the Brooklyn City Co., there would have been a cessation of operation, which, of course, would have been gravely detrimental to the public interest, and which in all probability would have imperiled the franchises of the Brooklyn City Co. and destroyed or substantially impaired its good will as a running railroad.

Such a course on the part of the court would have been unthinkable, and the Heights receiver was therefore confronted with the very practical necessity of continuing to operate the Brooklyn City Co. property

It was the effort of the court to keep together a unified system for the benefit both of the public and of the property involved. Financial and other problems which presented themselves to the receiver were of a most difficult character. He believed that he could continue to operate the Brooklyn City property, and it may well be that his belief would have matured into accomplishment, but for the strike which occurred in the summer of 1919.

[1] When the Heights receiver took possession, he had the right to disaffirm the lease at once, or to operate the road for such reasonable time as would enable him to form a judgment and to present his conclusions to the court. See American Brake Shoe & Foundry Co. v. New York Railways Co. (C. C. A.) 282 Fed. 523, decided June 21, 1922, for the most recent discussion as to the rights and duties of receivers in respect of leased property. In determining his rights and powers, the Heights receiver would naturally examine the provisions of the lease from the Brooklyn City Co. to the Heights Co., as well as the then status of the lessor and lessee with relation to each other.

[2] Prior to July 1, 1919, Brooklyn Heights Co. had failed to pay Brooklyn City Co. certain items of rental, such as certain of the taxes referred to in paragraph XV of the lease. Brooklyn City Co., however, had not enforced any of its remedies under the lease for failure to pay these rental items, but on July 1, 1919, it accepted the payment of $300,000, which was the quarterly payment on that item of the lease which required that 10 per cent. upon the capital stock of the lessor was to be paid quarterly on the 1st days of July, October, January, and April in each year. This quarterly payment under the terms of the lease was not a payment in advance for the quarter, but a payment on the day following the end of the quarter. The acceptance by Brooklyn City Co. of the quarterly payment of $300,000 on July 1, 1919, was in law a waiver by Brooklyn City Co. of its right to enforce its remedies under the lease in respect of any other defaults in the payment of rental items prior to July 1, 1919. Durand & Co. v. Howard & Co., 216 Fed. 585, 132 C. C. A. 589, L. R. A. 1915B, 998.

[3] In view of the foregoing and also of the terms of the lease, Brooklyn City Co. was not in a position to demand back its property from the receiver until some default occurred after July 14, 1919. In other words, so long as the receiver paid the various items constituting the rent, Brooklyn City Co. could not get back its property, nor, on the other hand, can it be said to have acquiesced in the operation by the Heights receiver during such period as the Heights receiver paid the stipulated rent. Indeed, it is agreed by counsel that the first date when a demand would be effective was October 1, 1919. This was because the Heights receiver paid the rental items as they became due, with the single exception of the sum of $87,476.93, which was an installment of the New York state gross earnings tax. The receiver, however, obtained from the state comptroller an extension of time within which to pay this tax, said extension being up to October 1, 1919.

In paragraph XV the lessee covenanted "to pay and discharge within a reasonable time after the same shall become due any and all taxes," etc. It was further provided:

"Should the lessee fail to make payments &ast; &ast; &ast; within the time herein required, then the lessor may after the expiration of said time pay the same and lessee agrees to repay the amount so paid to the lessor on demand."

The expression "within the time herein required" obviously means "within a reasonable time after the same shall have become due." October 1st, the extension date, was obviously "a reasonable time," and until that date, therefore, there was no default under the terms of the lease in the payment of this rental item. The result was that during the whole period from July 14 to and including September 30, 1919, the Heights receiver operated for the lessee's account.

[4] It is well settled that, when a receiver operates for lessor's account, the lessor is entitled to net earnings, if any, but he also runs the risk of being charged with a deficit, if any. At the time that the Heights receiver undertook this operation, no one knew how the operation would result. Where, as here, the lessor had not acquiesced, and was not in a legal position to acquiesce, it would have been manifestly unfair to the lessor to charge him with a deficit, if such had occurred, because, generally speaking, the operation for lessor's account is based on the lessor's consent or acquiescence. The answer to the contention on behalf of Brooklyn City Co. that the net earnings rule should apply for the period from July 14th to October 1st, and that, otherwise, an inequitable result would follow, is that the Brooklyn City Co. put itself in the position above described when it made its lease with the Heights Co. Under the lease, which did not provide for payment of rental in advance, the Brooklyn City Co. disabled itself from re-entry so long as the rental items were paid.

[5] Of course, the Heights receiver might have paid the stipulated rental for a period so long that his conduct could have been construed as an adoption of the lease. He might by his conduct have found himself in the position described in United States Trust Co. v. Wabash Western Railway Co., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085, recently analyzed in American Brake Shoe & Foundry Co. v. New York Railways Co., supra; but such was not the case here. The receiver is always entitled to a reasonable time within which to decide whether or not he shall adopt the lease, and his payment of rental items after July 14th until October 1st spreads over a period well within a reasonable time. While the facts may differ in immaterial detail, the principles governing the case at bar are substantially the same as those involved in the Second Avenue Case, 225 Fed. 734, 141 C. C. A. 6. But, if that case were laid aside, the fundamental difficulty which the Brooklyn City Co. cannot overcome is that it was never in the position from July 14th to October 1st to acquiesce, so as to make the receiver's operation for account of lessor, and it may be repeated, for emphasis, that, if the contrary were held, the result would have been unjust and inequitable against the lessor, if a deficit of operation had occurred.

What happened was that there was a surplus of some $89,000 for this period, after operating expenses had been deducted from receipts, although, of course, there was nowhere near enough obtained from operation with which to pay the October 1st quarterly rental. I am of

opinion, therefore, that the special master was right, and consequently that the operation from July 14th to October 1st was for the account of the lessee, and not of the lessor.

[6] 2. In considering the relations of the B. R. T. receiver to the Heights receiver and the Brooklyn City Co., it must be remembered that he was an outside party, i. e., a materialman furnishing power, maintenance, etc. The argument which the court has heard on more than one occasion was again presented; i. e., that there was identity between the B. R. T. receiver and the Heights receiver and between the two corporations. It is true that, as a holding company, B. R. T. owned the stock of the Heights Company; but that fact is one of no consequence in respect of the matters here under consideration. The creditors (lien and others) of each of these corporations are different, and the obligations of each are different. Prior to the receivership, the whole so-called B. R. T. system was unified and run in effect under a single management for purposes of economy of administration and harmony in policy. When the court was confronted with the necessity of appointing a receiver for the Heights Company and the other surface lines, it seemed desirable that the general plan instituted by so experienced an administrator as Judge Lacombe, in the Metropolitan receivership, should be followed. Subsequent events have justified this course in view of the many critical occasions where the whole situation demanded harmony of policy in matters affecting in the same way the various corporations in receivership. It is true, of course, that the ultimate decision in many matters rests with the court; but the court cannot be expected to supervise in detail the daily problems of administration.

In settling rights and stating accounts, however, it is immaterial that the same person happens to be the receiver of two corporations which in a given situation have antagonistic rights and interests. In such circumstances, in the last analysis, it is the court which decides, and it becomes unimportant that the same person happens to be the receiver of different corporations, each urging its own rights. The court, in such circumstances, is called upon to determine the rights of the respective receivers or corporations; and, in the same way, preliminary to that determination, the receiver of each asserts the rights of each and necessarily calls upon the court to decide as between conflicting interests.

It is rather a lay than a law argument to contend that there is no distinction between the Heights receiver and the B. R. T. receiver. The Heights receiver and the B. R. T. receiver in their relations to each other were called upon to deal with two important situations: (1) The prereceivership obligations owing from the Heights receiver to the B. R. T. receiver; and (2) the need of the Heights receiver after July 14th of the necessary power, maintenance, etc., from the B. R. T. receiver.

[7] The payment of the prereceivership power, etc., bills due to the B. R. T. is fully justified upon either of two grounds: (1) The necessity of payment as heretofore considered and passed upon in the Nassau Company Case; and (2) the legal position of the B. R. T. re-

ceiver as a materialman who could insist that his prereceivership bills should be paid out of the continuing income derived from operation of the Brooklyn City Co., even after the Brooklyn City Co. had regained possession of its property.

The first ground—i. e., that of necessity—need not be elaborated. It was fully considered in the Nassau Case, and is again referred to in this case in the report of the special master. The second ground needs no better nor more relevant authority than Virginia & Alabama Coal Co. v. Central Railroad, etc., Co., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068 (hereinafter called the Virginia Case).

What the Heights receiver did was to pay to the B. R. T. receiver the prereceivership power, etc., bills owing to the B. R. T. receiver and to leave unpaid the B. R. T. receiver's power, etc., bills incurred by the Heights receiver between July 14th and about September 10th. What the Heights receiver could have done, if he so desired, was to pay the bills of B. R. T. receiver, incurred between July 14th and about September 10th, and then pursue the continuing income of Brooklyn City Company for the payment of the prereceivership power bills of the B. R. T. receiver. The result would be the same, as will appear infra.

In addition to what has been said, attention must again be called to the condition of the Brooklyn City Co. on July 14th as affecting its relation with the B. R. T. receiver, if the Heights receiver had turned the property back at that time. Brooklyn City Co. would have been helpless for a very considerable period of time, certainly for a period quite beyond October 18th. The record shows that it would not have been possible to get the necessary cars and equipment in the open market, that the then ready cash situation of the Brooklyn City Co. was such as to present great difficulties, if its road had been returned and had been forced to operate without the aid of the B. R. T. receiver and the Heights receiver in furnishing it with cars, power, maintenance, etc., and the men necessary for a surface railroad operating organization.

Brooklyn City Co. was able to operate on October 18th only because there was a co-operative spirit around the circle, necessary in the public interest and fair, in the opinion of the court, because of the difficult position in which all the surface roads, including the Brooklyn City Co., found themselves in the summer and fall of 1919 due to then existing conditions which will be clearly recalled, but which need not be recited at length. If the necessities of the B. R. T. receiver and the Heights receiver or the Brooklyn City Co. were balanced one against the other, and if it may be imagined that actual threats were made one against the other, it is plain that the B. R. T. receiver was in the superior position and could refuse to furnish the necessary power, etc., unless his prereceivership bills were paid, and such refusal would have brought the B. R. T. receiver much less troublesome results than would have been imposed upon the Brooklyn City Co.

But, in any event, the Virginia Case, supra, would have protected the B. R. T. receiver. That case invites careful analysis. The Cen-

tral Company of Georgia executed a lease of a railroad controlled by it to the Georgia Pacific Company. The Georgia Company did not take possession of the property of the Central Company, or assume any control over the same, except that on the date of the lease it requested the Richmond & Danville Company to assume the control of the leased property, with which request there was an immediate compliance. The Danville Company ordered coal from the Virginia & Alabama Coal Company, and this coal was bought and actually used on the Central Company's road. Later the Central Company went into the hands of a receiver. It is not necessary to give the details of the entire procedure; suffice it to say that the Virginia & Alabama Coal Company sought to recover certain money for coal furnished for use on the lines of the Central Company. The Supreme Court held that there was a superior equity in favor of the materialman—i. e., Virginia Company—as against the mortgage bonds in the income, arising both before and after the appointment of the receiver, from the operation of the property. If the Supreme Court had thus decided upon the theory, in effect, that the lease from Central Company to Georgia Pacific Company was not valid, and that the Danville Company was the Central Company's agent, the case might have been inapplicable to that at bar, but the Supreme Court went further and arrived at the same result upon the assumption that the lease was lawful. This will be noted in the italicized part of the following extract from the opinion (170 U. S. 368, 369, 18 Sup. Ct. 662, 42 L. Ed. 1068):

"The dominant feature of the doctrine, as applied in Burnham v. Bowen, is that where expenditures have been made which were essentially necessary to enable the road to be operated as a continuing business, and it was the expectation of the creditors that the indebtedness created would be paid out of the current earnings of the company, a superior equity arises in favor of the materialman as against the mortgage bonds in the income arising both before and after the appointment of a receiver from the operation of the property. The equity thus held to arise when a purchase of necessary current supplies is made by the owning company is not in any wise influenced by the fact that the company itself is the purchaser of the supplies, but is solely dependent upon the fact that the supplies are sold and purchased for use, and that they are used in the operation of the road, that they are essential for such operation, and that the sale was not made simply upon personal credit, but upon the tacit or express understanding that the current earnings would be appropriated for the payment of the debt. Clearly, if the owning company had entered into an agreement with some individual to commit to his uncontrolled management as their agent the operation of the company's lines, the bondholders could not be heard to say that thereby no equities could arise in favor of labor or supply claimants in the income of the property preserved or kept in operation by their efforts. This would be the category in which the Danville Company would stand if the lease of the Central lines was not valid. *On the other hand, if the lease was lawful, upon the insolvency for any cause of the Danville Company while the lease continued in force, its relation toward its leased line in the adjustment and settlement, as against the leased road, of equities arising between those who had furnished supplies to the road and the bondholders would be precisely that of an owner of the leased lines, and if such possession is terminated by the court through the agency of a receiver equities in the income of the property continue to survive.*" (Italics mine.)

It will be seen that the point of the foregoing is that, if Danville Company, in effect the lessee, because operating for the Georgia Pacific

Company, the lessee, had become insolvent (in this case the Heights Company in the same position as the Danville Company) then the materialman (here B. R. T. receiver) could successfully claim a superior equity upon the current earnings of the lessor company (in that case Central Company and in this case Brooklyn City Co.), even after the property was again operated by the lessor. It is therefore seen that there is no point of distinction between that case and the case at bar, because the lessor and not the lessee property was operated by a receiver. The point is that the superior equity in favor of the materialman is in the continuing income of the lessor company. In other words, the Supreme Court in the Virginia Case has laid down a rule intended to protect the materialman in respect of current supplies, because it is these supplies which enable the railroad to continue its operation. As said in another part of the opinion (170 U. S. 365, 18 Sup. Ct. 661, 42 L. Ed. 1068):

"It was thus settled that, where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by a mortgage upon the property is a charge in equity on the continuing income, as well that which may come into the hands of a court after a receiver has been appointed as that before."

The lessor in the case at bar is in precisely the same position as the bondholders in the Virginia Case. By its lease it had turned over its property to the lessee, and the power, maintenance, etc., bills incurred prior to the receivership were necessary to keep the railroad a going concern, and, as a consequence, the B. R. T. receiver looked to and had a lien upon the income earned out of the Brooklyn City Co. property until his debt was satisfied. In such circumstances, the B. R. T. receiver could proceed against the Brooklyn City Company income until any balance due it was satisfied; for the effect of the Virginia Case is really to impose a lien in rem upon the continuing income of the railroad to which the supplies have been furnished, and, whatever other reasons may be advanced, it is apparent that public interest is a controlling element; for the Supreme Court cites Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963, in which much emphasis is placed upon the public interest. But this doctrine works out equitably, as well illustrated in the case at bar, where the continued supply of power, maintenance, etc., prior to the receivership, kept the Brooklyn City lines in operation.

It was the duty, therefore, of the Heights receiver to pay the B. R. T. receiver out of the money in his hands as Heights receiver, and, if he had not paid the B. R. T. receiver these prereceivership bills, the B. R. T. receiver could now pursue the operating net income of the Brooklyn City Co. produced any time after October 1st. Viewing, however, the claim of the B. R. T. receiver in accordance with the course of conduct actually pursued, it appears that, the prereceivership bills of the B. R. T. receiver having been paid by the Heights receiver, the former is now a creditor for the bills incurred during

the period, July 14th to October 1st, and in point of fact, as stated supra, for power, etc., furnished from July 14th to September 10th.

It is plain from the facts of the case that the power, etc., was not supplied solely on the personal credit of the Heights receivership. With large unpaid bills existing on July 14, 1919, with a situation of the most unpromising character, with grave doubt as to whether the Brooklyn City Co. could be operated other than with a loss, it is not to be supposed that the B. R. T. receivers supplied power, etc., only on the personal credit of the Heights receivership.

Yet, even though the Brooklyn City Co. could not itself have operated at any time between July 14th and October 1st, without the help of the B. R. T. receiver and the employees of the B. R. T. and the Heights receivers, it was manifest, as pointed out supra, that it was the duty of the Heights receiver to keep the Brooklyn City Co. road going in the interest of the public and of the Brooklyn City Co. itself. Whether power, maintenance, etc., had been furnished by the B. R. T. receiver or some other concern (and it is doubtful whether another concern could or would have supplied the needed power, maintenance, etc.) made no difference. Power, maintenance, etc., were vitally necessary to keep the road in operation, and, as has been pointed out, so long as the Heights receiver paid the rental items, the Brooklyn City Co. was in no different position than before the receivership, because of the position in which it had placed itself by the terms of the lease. Thus, again, the Virginia Case applies, and, under its doctrine, the B. R. T. erceiver can, at his choice, resort to the continuing income of the Brooklyn City Co. operation rather than to the personal liability of the Heights receivership.

[8] 3. As between the Heights receiver and the Brooklyn City Co., however, the former must pay the bills of his operation for lessee's account to the extent of his ability. He cannot operate for lessee's account, and unjustly enrich the lessee's estate by failing to pay his operating bills, just because the creditor may choose to assert his right to the in rem remedy against the subsequent income of the operated property.

The Heights receiver has asked a court of equity, in control of the Heights property, for instructions as to the disposition of the funds in his hands. These funds are divided broadly into three classes: (1) Free cash; (2) certain trust funds enumerated in the master's report; and (3) funds claimed to be under liens. Class (2) plainly cannot be utilized to pay the B. R. T. receiver, and the rights under class (3) have not been determined. Class (1), however, is available for the unpaid bills of receiver's operation. These unpaid bills, however, include not merely the bills of the B. R. T. receiver for power, maintenance, etc., supplied to operate the Brooklyn City Co. property, but various other claims which may be of equal equity and priority. If, then, the Heights receiver has, to illustrate, $1,000 free cash, and the claims of equal rank against his operation for lessee's account aggregate $2,000, he can, at present, safely pay only 50 per cent., and, if the B. R. T. receiver's bills for the July 14th-October 1st period were

$1,200, the Heights receiver could now pay $600 on account of such bills.

The actual status, however, is much more favorable to the Brooklyn City Co. than the foregoing proportions. I shall not attempt to state the figures accurately, but, instead of a charge against the Brooklyn City Co. of $342,190.16, the amount is apparently somewhere in the neighborhood of $100,000, as the amount due the B. R. T. receiver is less than $342,190.16, and the amount presently available out of the Heights free cash is around $200,000.

Under the authority of the Virginia Case, the B. R. T. receiver may collect at once the balance remaining out of the net income now earned or hereafter earned by Brooklyn City Co., and may therefore have a decree accordingly. On the other hand, Brooklyn City Co. may recover over against Heights receiver any further free cash which may come into his hands. If it should be held that the funds in the possession of the Heights receiver now claimed to be under liens are not subject to such liens, then, of course, such funds will also be available for the payment by Heights receiver to Brooklyn City Co. of any sum which Brooklyn City Co. may pay to the B. R. T. receiver.

It is quite likely that counsel can agree on a collation of the figures, and this subject can be dealt with and further testimony taken, if necessary, when the decree comes up for settlement.

4. Finally, on the question of jurisdiction, Gas & Electric S. Co. v. Manhattan & Queens Trac. Co. (C. C. A.) 266 Fed. 625, particularly at pages 633, 634 (cf. Hume v. City of New York, 255 Fed. 488, 166 C. C. A. 564), seems decisive.

5. Some exceptions have been withdrawn; others have become academic; and the subject-matter of others has been reserved for later consideration. These and all other details can be taken care of in the decree.

Except as what has been set forth supra may be modification of the master's report, the report is confirmed. Settle decree on five days' notice.