# VIRGINIA AND ALABAMA COAL COMPANY *v.* CENTRAL RAILROAD AND BANKING COMPANY OF GEORGIA.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 100.    Argued December 14, 15, 1897. — Decided May 9, 1898.

Where expenditures have been made which were essentially necessary to enable a railroad to be operated as a continuing business, and it was the expectation of the creditors that the indebtedness so created would be paid out of the current earnings of the company, a superior equity arises, in case the property is put into the hands of a receiver, in favor of the material man, as against mortgage bondholders, in income arising from the operation of the property both before and after the appointment of the receiver, which equity is not affected by the fact that the company itself is the purchaser of the supplies, but is solely dependent upon the facts that the supplies were sold and purchased for use, that they were used in the operation of the road, that they were essential for such operation, and that the sale was not made simply upon personal credit, but upon

the understanding, tacit or expressed, that the current earnings would be appropriated for the payment of the debt.

Upon the evidence contained in the record it is *Held*, that in the contract with the Virginia and Alabama Coal Company and in that with the Sloss Iron and Steel Company, it was the intention of the parties that the coal furnished was to be used in the operation of the lines of the Central Company, and that the Coal Companies looked to the earnings of the Central System as the source from which the funds to pay for the coal to be furnished were to be derived.

In concluding that the claims of the intervenors were entitled to priority out of the surplus earnings which arose during the control of the road by the court, this court must not be understood as in anywise detracting from the force of the intimations contained in its opinions in *Kneeland* v. *American Loan & Trust Co.*, 136 U. S. 89, and *Thomas* v. *Western Car Co.*, 149 U. S. 95.

On December 19, 1888, the Georgia Pacific Railroad Company leased its line of railroad extending from Atlanta to Birmingham, Alabama, to the Richmond and Danville Railroad Company, a corporation organized under the laws of Virginia, and which owned or controlled by lease a line of railroad from Atlanta to Washington, in the District of Columbia; and, thereafter, the Georgia Pacific road was operated by the Richmond and Danville Company. On June 1, 1891, the Central Railroad and Banking Company of Georgia, a corporation under the laws of Georgia, owning and operating a line of railroad from Atlanta to Savannah, Georgia, and which owned or controlled various other railroads or lines of steamships and a large amount of other property, executed a lease for ninety-nine years of said railroad and various lines and property controlled by it to the Georgia Pacific Company. The lease was signed on behalf of the Georgia Pacific Company by its president, pursuant to the direction of the board of directors of the company, but it was subsequently asserted that this was done without previous authorization or ratification of the stockholders. The Georgia Pacific Company did not take possession of the property of the Central Company or assume or exercise any control over the same, except that on the date of the lease it requested the Richmond and Danville Company to assume the control of the leased property, with which request there was an immediate compliance.

In March, 1892, a suit was instituted in the Circuit Court of the United States for the Eastern Division of the Southern District of Georgia by Rowena M. Clarke, a stockholder of the Central Company, to obtain a cancellation of the lease of the property of that company and other specific relief.. A temporary receiver was appointed on March 4, 1892. The Danville Company, as also the Georgia Pacific Company, appeared and disclaimed any rights under the lease, and, on March 28, 1892, the preliminary receiver, and other persons constituting the then board of directors of the Central Company, were appointed joint receivers to take charge of the railroad property and assets of the Central Company until there could be a reorganization of such board in pursuance to its charter.

As ancillary to Mrs. Clarke's bill, the Central Company, on July 4, 1892, filed a bill against the Farmers' Loan and Trust Company of New York, trustee, and other creditors, averring its inability to meet many matured obligations, and that it had defaulted on July 1, 1892, on the semi-annual interest due on $5,000,000 mortgage bonds dated October 1, 1872, for which the Farmers' Loan and Trust Company was trustee, and that for these reasons the directors were unable to assume the management of the property, and requesting the court by proper process to call upon its creditors to come into court, and that the court would administer the property for the benefit of all interested. . The Farmers' Loan and Trust Company assented to the continuance of the receivership; and, on July 15, 1892, under the depending bill, all the receivers, with the exception of one H. M. Comer, were discharged, and Mr. Comer was continued as receiver.

Subsequently, in May, 1893, under bills filed to foreclose a mortgage executed by the Savannah and Western Railroad Company, Comer and one Lowry were appointed receivers, and directed to continue to operate the road as part of the system of the Central Company. ·

On January 23, 1893, the Farmers' Loan and Trust Company of New York, trustee for the mortgage bondholders of the Central Railroad and Banking Company of Georgia, filed its dependent bill in said court for the foreclosure of the five

million dollar mortgage on the main stem of the Central Railroad from Atlanta to Savannah because of default in the payment of the interest due July 1, 1892, and the receivership was extended to that bill.

In an agreed statement of facts contained in the record, it was stipulated as follows:

"It is a fact that since the receivership the receivers of the Central Railroad and Banking Company of Georgia have expended [for] betterments in its railroad lines from the income of the roads during the receivership a sum much larger than the entire claim of the intervenors."

On June 30, 1893, a final decree was entered dismissing, for want of equity, the bill filed on behalf of Mrs. Clarke, it being, however, recited that the validity of the lease by the Central Company was not passed upon.

On May 26, 1892, the Virginia and Alabama Coal Company was allowed to become a party complainant in the Clarke suit and to file an intervening petition therein. The Central Company and its receivers and the Danville Company were made parties defendant to the intervention. It was averred in the petition that the Danville Company, while operating the Central Company, purchased from the intervenor, for the use and benefit of the Central, in its several divisions, coal, which purchase was made in pursuance of a contract of Danville, dated July 13, 1891. For coal furnished under said contract and actually delivered to the Central Company, (against which latter company in the course of said business the bills were originally made out,) and used by said Central Company in the running of its machinery, $26,607.44, as shown by a statement of account annexed to the petition.

The contract referred to in the petition reads as follows:

"Richmond and Danville Railroad Company.

"Office general purchasing agent; Joseph P. Minetree, general purchasing agent, Atlanta, Ga.

"The Virginia and Alabama Coal Company; Mr. J. R. Ryan, V. P. and G. M., Birmingham, Ala.

"DEAR SIR: We beg to accept your verbal offer of to-day

to furnish the C. R. and B. Co. of Ga. with, say 275,000 tons of best quality engine steam coal for the next twelve months, commencing July 1, 1891, and ending July 1, 1892, at 90 cents per ton of 2000 pounds, to be delivered on cars at mines, and to be shipped at times and in quantities to suit. Settlements for the coal delivered in any one month to be made on or about the first of the second succeeding month, and the C. R. and B. Co. of Ga. reserves the right to increase or decrease the monthly deliveries upon reasonable notice at any time. The division superintendents of the divisions for which the coal will be required will communicate with you as to the monthly deliveries, and all bills for coal furnished under this contract to be sent direct to the division superintendents. Kindly confirm this at once, and oblige, yours truly,

"(Signed)              JOSEPH P. MINETREE,
           " *General Purchasing Agent.*

"July 13, 1891."

Besides asking a decree against all the defendants jointly for the amount claimed with interest, the petition prayed for general relief. The petition was subsequently amended by averring that the Danville Company was liable under the contract or purchase, and that the Central Company was liable because the coal was bought and actually used for the benefit of the Central Company of Georgia.

An amendment was subsequently filed to the petition, setting up that the coal delivered by the Virginia Company had been furnished to the Central Company under the contract recited in the petition, and that said coal was furnished to the Central Company for the purpose of being used by it in the running of its machinery and the prosecution of its business; that a great portion of said coal remained on hand in the bins and storage places of the Central Company at the time of the appointment of the temporary receiver, and a large portion was still on hand when the board of receivers was appointed, and went into the possession of said receivers, and had since that time been actually used by the receivers in the running of the machinery of and the operation of the business of the

Central Company, and it was asked that an account might be taken as to the portions so used, and that it should be decreed to be a part of the operating expenses of the railroad company in the hands of the receivers, to be paid as a part of the expenses of the receivership.

On December 3, 1892, the Virginia and Alabama Coal Company, suing for the use of the Sloss Iron and Steel Company, a corporation under the laws of the State of Alabama, filed a further intervening petition, asking payment of an account aggregating $14,359.38, for coal furnished for use on the Central lines by the Sloss Company, under the contract between the Danville Company and the Virginia Company. Grounds of recovery were stated similar to those relied upon in the prior intervention, it being also insisted that if recovery was allowed against the receiver only for the coal used by him, it should be paid for at its value at the place where used, viz., $2.50 per ton.

To these interventions the Central Company and the receivers thereof separately demurred, while the Danville Company filed motions asking that it be dismissed as a party defendant thereto. The motions were overruled, while decisions upon the demurrers were deferred until the hearing of the interventions.

The issues raised by the respective interventions were referred to a master for report and decision. At different dates the master reported, recommending judgments in favor of the Virginia and Alabama Coal Company, on its behalf and as suing for the use of the Sloss Company, against the Danville and Central Companies and the receiver of the Central, jointly and severally, for the full amounts claimed with interest, and that upon the payment of the amount of the decree by the Central Company or its receiver, a judgment should be entered in its or his favor against the Richmond and Danville Company for whatever sum might be paid for coal delivered prior to March 4, 1892, and actually used before the appointment of a receiver. By a supplemental report the master reduced the judgment against the receiver for the benefit of the Virginia Company solely, by the sum $5543.10, with interest, and

the judgment for the use of the Sloss Company for the sum of $2682.80, owing to the fact that a specified quantity of the coal which had been sold and delivered under the contract had not been used on the lines of the Central Company, but by lines held to be independent roads. Exceptions were filed to the master's report, both as to his findings of fact and conclusions of law, on behalf of all parties to the intervention. The reports of the master and the exceptions filed thereto came on for hearing before the court; and, on December 29, 1893, an order was entered sustaining the exceptions in part and overruling them in part. A final decree was entered on January 1, 1894, and amended on March 31, 1894, setting aside the reports and adjudging that the Virginia and Alabama Coal Company recover from the Central Company $6171.98 for the "amount of unpaid for coal" in cars consigned to the officers of the Richmond and Danville Railroad Company, and which was unloaded after March 4, 1892, and appropriated by the receivers of the company, being 6857.75 tons, at ninety cents per ton; and the Virginia and Alabama Coal Company, suing for the use of the Sloss Iron and Steel Company, was adjudged to recover of the Central Company $735.16, for 816.85 tons of coal at ninety cents per ton, being the amount of unpaid for coal unloaded after March 4, 1892, and appropriated by the receivers. The receivers of the Central Company were directed to pay the sums so found due out of the current earnings of the Central Railroad and Banking Company in their hands.

An appeal was prosecuted from the final decree to the Circuit Court of Appeals for the Fifth Circuit, which court, on February 25, 1895, reversed the decree of the Circuit Court, 30 U. S. App. 263, and remanded the cause to that court "with instructions to enter a decree in favor of the intervenors, the Virginia and Alabama Coal Company and the Sloss Iron and Steel Company, for the amounts respectively due them for coal delivered to the lines under the control and forming a part of the system of the Central Railroad and Banking Company of Georgia, as shown by the evidence in this cause, including the coal furnished before the appoint-

ment of the receivers and that found in the bins of the line after such appointment and of which the receivers took possession; as well as the coal delivered to the receivers after their appointment, the amount due being determined by the contract price, and an order that they recover from the Central Railroad and Banking Company of Georgia and the receivers of the same such sums thus found to be due. No decree will be entered in favor of the intervenors for the payment of that portion of the coal which was used by the Charlotte, Columbia and Augusta Railroad Company."

An application for a rehearing being denied, a writ of certiorari was allowed by this court.

*Mr. Thomas Mayhew Cunningham, Jr.,* and *Mr. Alexander Rudolf Lawton* for the Central Railroad and Banking Company.

*Mr. Walter B. Hill* and *Mr. N. E. Harris* for the Virginia and Alabama Coal Company.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

In each of the intervening petitions a liability of the Central Company was asserted to arise from the fact that the coal was sold to and purchased by the Danville Company for use in operating the lines of railway of the Central Company, and in the lower courts, as in this court, it was contended that under the prayer for general relief the petitioners were entitled to have their demands allowed as a preferential claim against any surplus income which might arise from the operation of the Central road under the receiver, after payment of the ordinary expenses of operation, or out of the corpus of the estate or the proceeds of sale thereof, in the event that the income had been diverted by the receivers in expenditures for betterments.

Had the Central Company, through its own officers, operated its line of railway during the period when the coal in question

was furnished, it cannot be doubted, in the light of the decision in *Burnham* v. *Bowen*, 111 U. S. 776, that in the event that the company failed to make payment for such coal while a going concern, the indebtedness created, upon the appointment of a receiver might have been properly allowed as a charge upon the surplus income arising during the receivership. In the case referred to, an Iowa state court in the early part of 1875, and subsequently, by removal, a Circuit Court of the United States sitting in equity, took possession of, and operated through a receiver, a line of railway owned by the Chicago, Dubuque and Minnesota Railroad Company. When the receiver took control the company was indebted to the Northern Illinois Coal and Iron Company for coal furnished "during 1874," and used in running locomotives. During the receivership there was paid from the earnings which came into the hands of the receiver the amount of a judgment indebtedness for lands purchased by the company for its depot and offices, and also several judgments rendered against the company for its right of way. The sum of these payments by the receiver exceeded the amount of the indebtedness owing for the coal furnished as above stated. In October, 1876, a decree of strict foreclosure was entered, in which, however, a reservation was made, for future decision, of all matters in controversy between the plaintiffs and all and any of the defendants and intervenors and claimants. Among the persons who had intervened in the foreclosure proceedings was one Bowen, who had acquired acceptances which had been given to the coal company for the indebtedness referred to. He petitioned for a judgment against the railroad company for the amount of such indebtedness, "and that such judgment be declared a lien on the property and road of said company in the hands of said trustees and their grantees." A decree was entered on October 30, 1880, finding due to Bowen on his claim a specified sum, and declaring that the mortgaged property in the hands of the trustees under the decree of foreclosure was equitably bound for the payment thereof, "said property having passed to said trustees subject to the rights and equities of said Bowen, intervenor.

and said trustees, and all parties holding under them, taking said property subject to such rights and equities on the part of said Bowen, intervenor." Provision was then made for a sale of the property if the claim was not paid. An appeal having been taken by the trustees, this court held that, at time of the appointment of the receiver, the indebtedness in question was one of the current debts for operating expenses made in the ordinary course of a continuing business, to be paid out of current earnings. In the course of the opinion, speaking through Mr. Chief Justice Waite, the court reiterated the doctrine enunciated in *Fosdick* v. *Schall*, 99 U. S. 235, 252, where it was declared that: "The income [of a railroad company] out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income."

And it was further said pp. 781, 782 :

"So far as anything appears on the record, the failure of the company to pay the debt to Bowen was due alone to the fact that the expenses of running the road and preserving the security of the bondholders were greater than the receipts from the business. Under these circumstances, we think the debt was a charge in equity on the continuing income, as well that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in *Fosdick* v. *Schall*, the "current debt fund," as to make it proper to require the mortgagees to pay it back. So far as current expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience

to use it if no change in the possession had been made. This rule is in strict accordance with the decision in *Fosdick* v. *Schall*, which we see no reason to modify in any particular."

It was thus settled that where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by a mortgage upon the property is a charge in equity on the continuing income as well that which may come into the hands of a court after a receiver has been appointed as that before. It is immaterial in such case, in determining the right to be compensated out of the surplus earnings of the receivership, whether or not during the operation of the railroad by the company there had been a diversion of income for the benefit of the mortgage bondholders, either in payment of interest on mortgage bonds or expenditures for permanent improvements upon the property. Nor is the equity of a current supply claimant in subsequent income arising from the operation of a railroad under the direction of the court affected by the fact that while the company is operating its road its income is misappropriated and diverted to purposes which do not inure to the benefit of the mortgage bondholders and are foreign to the beneficial maintenance, preservation and improvement of the property. This principle finds support in *Miltenberger* v. *Logansport Railway Company*, 106 U. S. 286, 311, 312, the decision in which case was approvingly referred to in *Union Trust Company* v. *Illinois Midland Company*, 117 U. S. 434, and in the recent case of *Thomas* v. *Western Car Company*, 149 U. S. 95, 110. In the *Trust Company case*, the court said (p. 456):

"The principle laid down in *Wallace* v. *Loomis* was applied in *Miltenberger* v. *Logansport Railway Company*, 106 U. S. 286, 311, 312. In that case a bill was filed by a second mortgagee against the mortgagor and a first mortgagee and judgment creditors of the mortgagor to foreclose a mortgage on

a railroad. On the day the bill was filed, and without notice to the first mortgagee, a receiver was appointed, and power given him to operate and manage the road, 'receive its revenues, pay its operating expenses, make repairs, and manage its entire business, and to pay the arrears due for operating expenses for a period in the past not exceeding ninety days, and to pay into the court all revenue over operating expenses.' After that, and without notice to the first mortgagee, who had not appeared, though notified of the order appointing the receiver, and of the pendency of the suit, the court authorized the receiver to purchase engines and cars, and to adjust liens on cars, owned by the mortgagor, and to pay indebtedness not exceeding $10,000, to other connecting lines of road, in settlement of ticket and freight accounts and balances, and for materials and repairs, which had accrued in part more than ninety days before the order appointing the receiver was made, and to construct five miles of new road, and a bridge. The petition for the order stated the necessity for the rolling stock and for the adjustment of the liens; that the payment of the connecting lines was indispensable to the business of the road, and it would suffer great detriment unless that was provided for; and that the new road and the bridge would come under the mortgages, and their construction would be to the advantage of the bondholders. After the first mortgagee had appeared and answered, an order was made, but not on prior notice to it, authorizing the receiver to issue certificates to pay for rolling stock he had bought under orders of the court, and to pay debts incurred for building the five miles of road and the bridge, under those orders, and to pay debts incurred for taxes, and rights of way, and back pay, and supplies in operating the road, the certificates to be payable out of income, and, if not so paid, to be provided for by the court in its final order. Claims thus arising were afterwards allowed to be paid out of the proceeds of sale before the mortgage bonds. This court upheld such priority, as to the debts for the purchase of rolling stock, and for the adjustment of liens, and for the construction of the five miles of road and the bridge, and for the amount due connecting lines,

some of which were incurred more than ninety days before
the receiver was appointed.   On the latter branch of the sub-
ject it said : ' It cannot be affirmed that no items which ac-
crued before the appointment of a receiver can be allowed in
any case.   Many circumstances may exist which may make
it necessary and indispensable to the business of the road and
the preservation of the property for the receiver to pay pre-
existing debts of certain classes, out of the earnings of the
receivership, or even the corpus of the property, under the
order of the court, with a priority of lien.   Yet the discre-
tion to do so should be exercised with very great care.   The
payment of such debts stands, *prima facie*, on a different
basis from the payment of claims arising under the receiver-
ship, while it may be brought within the principle of the
latter by special circumstances.   It is easy to see that the
payment of unpaid debts for operating expenses, accrued
within ninety days, due by a railroad company suddenly de-
prived of the control of its property, due to operatives in its
employ, whose cessation from work simultaneously is to be
deprecated, in the interests both of the property and of the
public, and the payment of limited amounts due to other and
connecting lines of road for materials and repairs, and for
unpaid ticket and freight balances, the outcome of indispensa-
ble business relations, where a stoppage of the continuance of
such business relations would be a probable result, in case of
non payment, the general consequence involving largely, also,
the interests and accommodations of travel and traffic, may
well place such payments in the category of payments to pre-
serve the mortgaged property in a large sense, by maintain-
ing the good will and integrity of the enterprise, and entitle
them to be made a first lien.   This view of the public interest
in such a highway for public use as a railroad is, as bearing
on the maintenance and use of its franchises and property in
the hands of a receiver, with a view to public convenience,
was the subject of approval by this court, speaking by Mr.
Justice Woods, in *Barton* v. *Barbour*, 104 U. S. 126.' "

   Is there any good reason why the equitable doctrine applied
in the cases to which we have referred should not be applied

under a state of facts such as shown at bar, where the immediate management of a road was confided by its owners, without protest or interference by the bondholders, to third parties? It would seem not. The dominant feature of the doctrine, as applied in *Burnham* v. *Bowen*, is that where expenditures have been made which were essentially necessary to enable the road to be operated as a continuing business, and it was the expectation of the creditors that the indebtedness created would be paid out of the current earnings of the company, a superior equity arises in favor of the material man as against the mortgage bonds in the income arising both before and after the appointment of a receiver from the operation of the property.

The equity thus held to arise when a purchase of necessary current supplies is made by the owning company, is not in anywise influenced by the fact that the company itself is the purchaser of the supplies, but is solely dependent upon the fact that the supplies are sold and purchased for use, and that they are used in the operation of the road, that they are essential for such operation, and that the sale was not made simply upon personal credit, but upon the tacit or express understanding that the current earnings would be appropriated for the payment of the debt. Clearly, if the owning company had entered into an agreement with some individual to commit to his uncontrolled management as their agent the operation of the company's lines, the bondholders could not be heard to say that thereby no equities could arise in favor of labor or supply claimants in the income of the property preserved or kept in operation by their efforts. This would be the category in which the Danville Company would stand if the lease of the Central lines was not valid. On the other hand, if the lease was lawful, upon the insolvency for any cause of the Danville Company while the lease continued in force, its relation toward its leased line in the adjustment and settlement, as against the leased road, of equities arising between those who had furnished supplies to the road and the bondholders would be precisely that of an owner of the leased lines, and if such possession is terminated by the court through

the agency of a receiver equities in the income of the property continue to survive.

Upon the evidence contained in the record, we hold that the contract upon which both intervenors relied — the deliveries of coal furnished by the Sloss Company being under the contract which had been made with the Virginia Company — was made with the Danville Company, but we conclude from the terms of the contract that the intention of the parties was that the coal was to be used in the operation of the lines of the Central Company, and that the mining companies did not rely simply upon the responsibility of the Danville Company, but on the contrary that the coal companies looked to the earnings of the Central system as the source from which the funds to pay for the coal to be furnished was to be derived.

While it was established that during the time the Danville Company was in control of the Central property a semi-annual instalment of interest — which exceeded the amount of the claims of the intervenors — was paid to the holders of bonds of the Central Company, we cannot say that there was a diversion of income from the Central lines for such purpose. At the best it could only be conjectured that such payment was probably made from that income. Whether, however, there was a diversion of income before the receivership, inuring to the benefit of the bondholders, the equity in favor of the coal company for payment out of subsequent income, as we have seen, survived and attached to the property when it was taken possession of by the receiver; and if a surplus of income was created by the operations of the road under the receiver, sufficient to satisfy the claims of the intervenors, the right to demand that the surplus income bo applied in satisfaction of the claims in question was undoubted. From the evidence we find that there was such surplus. It was stipulated in the record, as a fact, " that since the receivership, the receivers of the Central Railroad and Banking Company of Georgia have expended for betterments on its railroad lines from the income of the roads during the receivership a sum much larger than the entire claim of the intervenors." Keep-.

ing in mind the manifest purpose of this stipulation, which undoubtedly was to present the question of the right of the claimants to resort to the corpus of the estate for payment of their claims, we must give the term "betterments" a broad and not a restricted meaning. So construed, it must be held to have referred to expenditures for the improvement of the property as distinguished from mere payments for operating expenses and ordinary repairs which are usual and legitimate terms of outlay from current receipts. This is the sense in which the term was understood by this court in *Union Trust Company* v. *Illinois Midland Company*, 117 U. S. 434, where the validity of receivers' certificates was upheld, which had been paid out of the proceeds of the sale of the corpus of the property, because issued to replace earnings diverted from paying operating expenses and ordinary repairs to payment of betterments (p. 462).

The circumstance that it is uncertain from the terms of the stipulation, whether the expenditures for betterments were made by the receivers under the stockholders' bill, or under the bill filed by the Central Company or under the trustee's bill for foreclosure, is immaterial. Even though the mortgages securing the bonds provided for the sequestration by foreclosure of the income of the road for the benefit of the bondholders, for reasons already stated, that income until strict foreclosure or a sale of the road was charged with the prior equity of unpaid supply claimants such as those now before the court.

In concluding that the claims of the intervenors were entitled to priority out of the surplus earnings which arose during the control of the road by the court, we must not be understood as in anywise detracting from the force of the intimations contained in the recent utterances of this court in the *Kneeland* (136 U. S. 89) and *Thomas* (149 U. S. 95) *cases*, as to the necessity of a court of equity confining itself within very restricted limits in the application of the doctrine that in certain cases a court having a road or fund under its control may be justified in awarding priority over the claims of mortgage bondholders to unsecured claims originating prior

to a receivership. In the *Kneeland case*, however, the claim refused priority was based upon an alleged instrument of lease, and was for four months' rental of cars operated on a line of railroad by a receiver appointed at the suit of a judgment creditor, such receiver being succeeded in office by a receiver appointed in the foreclosure proceedings instituted by the trustees of the mortgage bondholders. It was held that the alleged contracts of lease were in substance and effect "antecedent contracts of sale;" that in those contracts ample provision had been made by the vendor for his security, by stipulations authorizing a retaking of the property upon failure to make payment promptly of the instalments of purchase money as they became due, and that the claim against the fund was in reality for a portion of the purchase price of the cars. Under these circumstances, the debt was held not to be embraced "in the few specified and limited cases" in which this court "has declared that unsecured claims were entitled to priority over mortgage debts;" and particular attention was called, among other things, to the fact that the receivership at the suit of the judgment creditor was not for the benefit of the mortgage bondholders, so that it could not be asserted that the expenditures of such receivership were payable in any event out of the income or corpus of the property; and the fact was also noticed that from the time of the purchase of the rolling stock in question in the suit to the time of the final disposition of the mortgage foreclosure the receipts did not equal the operating expenses, and there had been no diversion of the current earnings, either to the payment of interest or the permanent improvement of the property. In the *Thomas case*, claims for rental of cars, which rental had accrued prior to the receivership, were denied priority over the mortgage bonds, but the facts in that case were such as to justify the conclusion that the car company contracted "upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity." In neither the *Kneeland* nor the *Thomas case* was there any intention to question the prior decisions of the court, which allowed priority to claims based upon the

furnishing of essential and necessary current supplies, not sold upon mere personal credit, against the surplus income arising during the operation of the road under the direction of a court of equity.

In view of the conclusion which we have reached, none of the other matters urged in argument need be noticed. The decree of the Circuit Court of Appeals being in consonance with the views we have expressed, the decree of that court is

*Affirmed.*

Mr. Justice Peckham and Mr. Justice McKenna, not having heard the argument, take no part in this decision.