**CONTINENTAL TRUST CO. et al. v. W. R. BONSAL & CO. et al.**

No. 3646.

Circuit Court of Appeals, Fourth Circuit.

Oct. 2, 1934.

Gordon M. Buck, of New York City (Carlyle Barton and Edward Duffy, both of Baltimore, Md., Theodore S. Garnett, of Norfolk, Va., Humes, Buck, Smith & Stowell, of New York City, Baird, White & Lanning, of Norfolk, Va., Albridge C. Smith, of New York City, Edward R. Baird, Jr., of Norfolk, Va., Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Hughes, Little & Seawell, of Norfolk, Va., Edwin S. S. Sunderland, of New York City, Leon T. Seawell, of Norfolk, Va., and Thomas O'G. FitzGibbon, of New York City, on the brief), for appellants.

T. H. Willcox, of Norfolk, Va., and C. Francis Cocke, of Roanoke, Va. (Willcox, Cooke & Willcox, of Norfolk, Va., Cocke, Hazelgrove & Shackelford, of Roanoke, Va., and Weltner, Meadow & Russell and William K. Meadow, all of Atlanta, Ga., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal by the trustees of the three general mortgages of the Seaboard Air Line Railway Company from an order according priority under the "six months" rule to certain supply claims filed with the railway receivers. No question is raised as to the sufficiency of the net operating income to pay these and other claims filed, without resort to the corpus of the property; and there is no effort to have the claims declared a charge on the corpus. The trustees contend that the claims do not represent operating expenses but are for supplies furnished for reconstruction and betterments, which have been charged in large part to capital account under the rules of the Interstate Commerce Commission, and that for this reason they are not entitled to priority under the six months' rule. The finding of the special master approved by the court below was that the supplies were furnished in connection with projects which were absolutely necessary to the continued operation of the railway and that they added to the value of the property, as well as made possible its continued operation; that they were furnished, not on the general credit of the corporation, but in the expectation that they would be paid from current income; and that they were furnished within the six months next preceding the receivership.

The claims involved in the appeal all relate to supplies used in the construction or repair of bridges on the main line of the railway. That of the Barnett National Bank, assignee of the Vernon Townsend Lumber Company, is for $3,508.76, the value of crossties used in the construction of a bridge over the Appomattox river at Petersburg, Va. Claim of Hildreth & Co. is for $929.34 for inspecting the same bridge. Claim of Oglesby Granite Quarries is for $948.15 for rip-rap stone used in connection with replacing a truss span and 500 feet of trestle at the Enoree river bridge. The claim of the Virginia Bridge & Iron Company is for $6,902.87, of which $1,770.84 is for two steel pier casings for strengthening piers which had cracked on the James river bridge at Richmond; $316.79 is for a steel casing for making a similar repair on the Great creek bridge, and $4,815.24 is for structural steel and other bridge material furnished for repairing the Savannah river bridge.

The Petersburg bridge is on the main line of the railway going north towards Richmond, and a large part of the freight and passenger traffic of the Seaboard System passes over it. In 1930 the bridge was an old structure, consisting partly of steel and partly of wood, with a wide and dangerous curvature; the steel portion of the bridge having been erected in 1899. Since 1899, to accommodate the increasingly heavy trains passing over it, the bridge had been strengthened three times. In 1930 it was again showing signs of weakness and further strengthening was not practicable. It was necessary, therefore, that a new bridge be built; and the work of building it was undertaken in 1930, and had not been completed when the receivers were appointed in December of that year. Upon petition to the court, the receivers were allowed to complete the bridge under contracts which had been made by the railroad company; and it appears that in completing it the ties furnished by the Vernon-Townsend Lumber Company must have been used. The new bridge cost $527,711.61, of which $426,756.99 was charged to capital account. It is stated that all of the claims for labor and material used in its construction have been paid either

by the railway company or the receivers, except the small claim of the Vernon-Townsend Lumber Company for cross-ties and the inspection charge of Hildreth & Co.

The facts with respect to the Enoree river bridge are thus set forth in the special masters report: "The Enoree River bridge and trestle had been in existence for a great many years as a part of the railway company's main line, but had become weakened so that in the opinion of the proper officers of the railway company it required prompt replacement. The gross cost of the project was approximately $73,000.00, which amount, less the value of the material retired and certain labor charges, was charged by the railway company to capital account under the Interstate Commerce Commission rules, but the claimant does not concede that it was properly so charged."

With respect to the bridges repaired at the James river, Great creek and the Savannah river, to which the claim of the Virginia Bridge & Iron Company relates, the facts as stipulated and embodied in the report of the special master are as follows:

"$1,770.84 represents the purchase price of two steel pier casings acquired by the railway company from the claimant and used to incase two of the piers supporting the James River Bridge, on the main line of the railway company at Richmond, Virginia. The piers which were incased had cracked, creating a dangerous condition. The steel casings were placed around the piers and filled with concrete in order to strengthen the piers and eliminate the dangerous condition. The gross cost of the project was $4,862.90, all of which was charged by the railway company to capital account under the Interstate Commerce Commission rules, but the claimant does not concede that it was properly so charged.

"$316.79 represents the purchase price of one steel casing acquired by the railway company from the claimant and used to incase one of the piers supporting the Great Creek bridge on the main line of the railway company at Cochran, Virginia. The pier had become cracked and weakened, creating a dangerous condition. The casing was placed around the pier and filled with concrete in order to strengthen the pier and eliminate the dangerous condition. The gross cost of the project was $2,800.64, of which $789.74 was charged to operation and $2,010.90 was charged to capital account under the Interstate Commerce Commission rules, but the claimant does not concede that it was properly so charged.

"$4,815.24 represents the purchase price of structural steel and other bridge material furnished, and compensation for services rendered, by the claimant in connection with replacing the Savannah River bridge on the main line of the railway company near Calhoun Falls, South Carolina. In the opinion of the proper officers of the railway company the old bridge required immediate replacement because it had become weakened because of age and was too light for the loads which the railway company was hauling over it. The old bridge consisted of three 150′ deck trusses and the new bridge which replaced it was composed of six 76′ deck girder spans and seven bents. The claimant also placed additional shims under some of the girders in connection with using for the new bridge some of the piers which had been used for supporting the old bridge. In addition to the work done by the claimant it constructed three new concrete piers and extended the heads of three existing piers to furnish the supports for the new bridge. The gross cost of the project was $50,283.05, of which $29,064.62 was charged by the railway company to operation, and $21,218.43 to capital account, under the Interstate Commerce Commission rules, but the claimant does not concede that it was properly so charged."

The principle upon which the six months' rule is based was first laid down by the Supreme Court in Fosdick v. Schall, 99 U. S. 235, 251, 25 L. Ed. 339, where the court said: "We have no doubt that when a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. * * * The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go

978

to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income."

In Virginia & Alabama Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 S. Ct. 657, 661, 42 L. Ed. 1068, the court made it clear that the priority accorded by the rule as against surplus earnings was not dependent upon diversion of income for the benefit of bondholders, and that the income subject to the prior charge under the rule was income earned after the appointment of receivers as well as before. That case dealt with a claim for coal purchased for the operation of the road prior to receivership; and the court after adverting to Fosdick v. Schall and Burnham v. Bowen, 111 U. S. 776, 4 S. Ct. 675, 28 L. Ed. 596, a later case applying the doctrine, said: "It was thus settled that, where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by a mortgage upon the property, is a charge in equity on the continuing income as well that which may come into the hands of a court after a receiver has been appointed as that before. It is immaterial in such case, in determining the right to be compensated out of the surplus earnings of the receivership, whether or not during the operation of the railroad by the company there had been a diversion of income for the benefit of the mortgage bondholders, either in payment of interest on mortgage bonds or expenditures for permanent improvements upon the property." And later in the opinion the court said, page 368 of 170 U. S., 18 S. Ct. 657, 662: "The equity thus held to arise when a purchase of necessary current supplies is made by the owning company, is not in any wise influenced by the fact that the company itself is the purchaser of the supplies, but is solely dependent upon the fact that the supplies are sold and purchased for use, and that they are used in the operation of the road, that they are essential for such operation, and that the sale was not made simply upon personal credit, but upon the tacit or express understanding that the current earnings would be appropriated for the payment of the debt."

In Southern R. Co. v. Carnegie Steel Company, 176 U. S. 257, page 285, 20 S. Ct. 347, 358, 44 L. Ed. 458, which involved a claim of more than $125,000 for steel rails purchased before receivership, the court reviewed the prior decisions and summed them up as follows: "This court has uniformly refrained from laying down any rule as absolutely controlling in every case involving the right of unsecured creditors of a corporation, whose property is in the hands of a receiver, to have their demands paid out of net earnings in preference to mortgage creditors. But it may be safely affirmed, upon the authority of former decisions, that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current receipts before he has any claim upon such income; that, within this rule, a debt not contracted upon the personal credit of the company, but to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt; that whether the debt was contracted upon the personal credit of the company, without any reference to its receipts, is to be determined in each case by the amount of the debt, the time and terms of payment, and all other circumstances attending the transaction; and that when current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of any funds thus improperly diverted from their primary use."

And in view of the fact that the receivers here completed the work on the Petersburg bridge, taking over the contracts of the railroad company, the following passage of the opinion, appearing at 176 U. S. 288, 20 S. Ct. 347, 359, 44 L. Ed. 458, is pertinent: "It is apparent that the purchases of new steel rails while the railroads were in possession of receivers were made in the ordinary course of business and were properly chargeable upon and payable out of current receipts in preference to the claims of mortgage creditors.

In every substantial sense the expenses thus incurred were operating expenses. They were incurred in the interest of mortgage creditors, the value of whose securities depended upon the unity of the Danville system being preserved and the interests of all concerned not allowed to go to ruin. Why should a different rule be applied to the contracts made with the Carnegie Company shortly before the appointment of receivers in the Clyde suit, the original contract being for only 2,500 tons, and the last one for only 1,656 tons? Is it to be said that the contract for 2,000 tons of steel rails and the contract for 2,500 tons, made by the receivers in the foreclosure suit, created debts of a preferential character, while contracts made by the railroad company of exactly the same kind shortly before the appointment of receivers for 2,500 and 1,656 tons of steel rails could not under any circumstances become a preferential debt chargeable upon current receipts? Surely the quantity of rails purchased from the Carnegie Company and delivered in 1891 was insignificant in view of the interests involved and the extensive mileage of the Danville system, and was by no means so large as to suggest that they were to be used in constructing new and additional road, and not to keep existing roads in proper condition for use."

And the limitations upon the doctrine of the case are thus stated at page 296 of 176 U. S., 20 S. Ct. 347, 362: "We must not be understood as saying that a general, unsecured creditor of an insolvent railroad corporation in the hands of a receiver is entitled to priority over mortgage creditors in the distribution of net earnings simply because that which he furnished to the company prior to the appointment of the receiver was for the preservation of the property and for the benefit of the mortgage securities. That, no doubt, is an important element in the matter. Before, however, such a creditor is accorded a preference over mortgage creditors in the distribution of net earnings in the hands of a receiver of a railroad company, it should reasonably appear from all the circumstances, including the amount involved and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad incurred in the ordinary course of business, and to be met out of current receipts."

The decision in Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 20 S. Ct. 363, 369, 44 L. Ed. 475, decided on the same day as the case last cited, throws light on the doctrine of that case and the limitations of the doctrine there prescribed. The Lackawanna Case concerned a claim for rails furnished for and used in what was in effect reconstruction, "or the construction of new road." In denying priority to the claim, the court said: "They are rather to be regarded as extraordinary expenditures, outside of the ordinary course of business and incurred for purposes not of repair but of construction."

In Virginia Passenger & Power Co. v. Lane Bros. Co. (C. C. A. 4th) 174 F. 513, 517, certiorari denied 215 U. S. 610, 30 S. Ct. 411, 54 L. Ed. 348, this court dealt with a case where a street railway company had contracted for the improvement of a water power to be used instead of steam at one of its plants, where the equipment was old, unreliable, and likely to break down. As in the case of the Petersburg bridge here, the receivers were ordered to continue the work. The court applied the "six months" rule in granting priority to claims for work done on the project prior to receivership, although payments made on the work had been charged to construction account, holding that the work was not new construction but permanent improvement, and that the rule laid down in the case of Southern R. Co. v. Carnegie Steel Co., supra, was applicable. The court (Goff, Pritchard, and Brawley, JJ.), speaking through Judge Brawley, said: "The precise nature of this account is not stated in the report of the case. It may have been proper for the company, as a matter of bookkeeping, to charge this improvement to construction account, but it is plain that the indebtedness incurred was for the permanent improvement of the mortgaged property. It was not a new construction in the sense that the building of a new railroad, or the building of a new plant, would be, but was, as said by the judge below, 'something necessary in furtherance of the more effective and economical operation of the existing plant. * * *' That the receivers and the general manager of the company considered that the completion of the work upon the canal was absolutely essential to keeping the company a 'going concern' is evidenced by their acts, and that the court which had the responsibility of protecting the property and its bondholders was impressed by its necessity is shown by its orders, among the first entered after the appointment of the receivers. If that be so, how can it be justly claimed that the work done by the petitioners during the month immediately preceding the appointment of the receivers was not of equal necessity?"

We think that the court below was clearly right in applying the rule to the claims here involved. All of them represent supplies furnished the railroad within six months prior to the receivership; and both the court and the special master have found, and there is nothing in the record to justify a contrary finding, that they were furnished, not on the general credit of the railroad, but with the expectation that they would be paid for out of current earnings. Indeed, there is evidence that the broker for the lumber company, which furnished the cross-ties for the Petersburg bridge, had on various occasions been advised with respect to other sales of like character that such bills were to be paid out of income and could not be met until the treasury department of the road should receive remittance of traffic balances and collections from freight and passenger agents.

The objection to the allowance of priority chiefly stressed by appellants is that the supplies furnished were not for operation but for improvements or betterments to the property of the road, which were charged to capital account under the rules of the Interstate Commerce Commission. But we do not think that this is a valid objection to the allowance of priority. As said in the Carnegie Steel Co. Case, supra, "a debt not contracted upon the personal credit of the company, but to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt." And the rule as stated in Fosdick v. Schall, supra, repeatedly quoted with approval, lists debts for improvements along with those for labor, supplies, and equipment as being entitled to priority, if incurred in order that the railroad may be continued in operation as a going concern.

The principles applicable in determining priority for such claims are entirely different from those which control in matters of bookkeeping. Charges to capital account in the books of the railroads are made for the purpose of determining the amount of investment as a basis of rate making, bond issues, etc. Priority is allowed claims for supplies under the "six months" rule, not because the supplies have not added to capital, but because they have been necessary to the continued operation of the road and have been supplied with the expectation that they would be paid for out of current income. To use the language of Burnham v. Bowen, 111 U. S.

776, 780, 4 S. Ct. 675, 28 L. Ed. 596, they are "debts of the income" and should be paid from the income before it is applied to the use of the mortgagees. They are debts of the income, not because they would ordinarily be charged to current expense, but because they have been necessary to the production of the income in the ordinary operation of the road. This "six months" rule has recently received legislative approval in being applied by Congress to railroad reorganizations under the Bankruptcy Act as amended (section 77 (e), 47 Stat. 1477, 11 USCA § 205 (e). It should not be unduly restricted or "whittled away" by technical refinements or matters of bookkeeping.

We are not to be understood as holding, or as construing Virginia Passenger & Power Co. v. Lane Bros. Co., supra, to hold, that a claim is entitled to priority under the six months' rule merely because supplies furnished have been used to improve the property and have added to the value of the mortgage security. In addition to having been incurred within six months and with the expectation that it should be met out of current receipts, the debt, as was said in the Carnegie Steel Company Case, must be one which is "fairly to be regarded as part of the operating expenses of the road incurred in the ordinary course of business." See Illinois Trust & Savings Bank v. Doud (C. C. A. 8th) 105 F. 123, 52 L. R. A. 481, and Atlantic Trust Co. v. Dana (C. C. A. 8th) 128 F. 209. What we do mean to say, however, is that, where the debt meets these requirements, it is not to be denied priority merely because the supplies furnished have resulted in improvements to the property or have been charged to capital account. Indeed it is well settled that where net income has been diverted from the payment of operation expenses to the improvement of the corpus of the property, supply claimants entitled to priority under the six months' rule may have the corpus charged with liability for their claims to the extent of the income thus diverted. Burnham v. Bowen, 111 U. S. 776, 781, 4 S. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Morrison, 125 U. S. 591, 612, 8 S. Ct. 1004, 31 L. Ed. 825; Gregg v. Metropolitan Trust Co. (C. C. A. 6th) 124 F. 721, 722, affirmed 197 U. S. 183, 25 S. Ct. 415, 49 L. Ed. 717; Finance Co. of Penn. v. Charleston, etc., R. Co. (C. C.) 48 F. 188; Wood v. New York & N. E. R. Co. (C. C.) 70 F. 741, 743; Birmingham Trust & Savings Co. v. Atlanta, B. & A. R. Co. (D. C.) 300 F. 173, 178; and see Present Status of the Six Months Rule by Thomas O'Gorman

FitzGibbon, 34 Columbia Law Review 244-245. And, in the face of these holdings, it would be little short of absurd to say that one who has furnished supplies necessary to keep the road in operation, and who is otherwise entitled to priority under the six months' rule, is to be denied such priority upon the objection of bondholders merely because the supplies which he has furnished have improved the property and thus increased the security of these bondholders.

It is true that the basis of the rule is that the bondholder impliedly agrees that the current debts made in the ordinary course of business shall be paid from current receipts before he shall have any claim on the income; and for this reason expenditures for additions and permanent improvements which cannot be fairly regarded as a part of the operating expenses of the road, incurred in the ordinary course of business, cannot be allowed priority as a charge against income under the rule, for the bondholder has not consented to be improved out of his security. But in considering what items are to be included in such operating expenses, due regard must be had for surrounding circumstances; and a claim for supplies necessary to the continued operation of the road is not to be denied priority merely because such supplies have been used in a structure which constitutes an improvement over one which it replaces. It is quite customary in the history of large and growing railroads to replace worn-out equipment with equipment of a more costly character, designed to meet the demands of modern traffic; and mortgage bondholders are, of course, aware of these recurring necessities and practices. In every such case, the exercise of reasonable judgment is required to decide whether, in view of the magnitude of the business and of the replacement of old by new and better equipment, the operation crosses the line of usual and customary practice and becomes a work of extraordinary character for which no priority may be allowed.

In the case at bar, we do not think that it can be fairly said of any of the expenditures involved that they were extraordinary or outside the ordinary course of business. While the repairs made constituted improvements, they were necessary to keep the main line of a great railway system in operation and were not of such a character that the bondholders might not have anticipated that they would be made in the course of the ordinary operation of the road.

We feel that there can be little question as to the correctness of the conclusion reached as to the repairs on the bridges other than the Petersburg bridge. As to this bridge, the total of the expenditures and the nature of the improvement raise a more serious question; but, even as to it, there are special circumstances which we think bring the claims here involved well within the spirit of the "six months" rule. The reconstruction of this bridge was essential to keep the railroad on its feet as a going concern. The expenditures were for the preservation of the property and the benefit of mortgage securities; and the Supreme Court, in the Carnegie Steel Company Case, has said that this is an important element in the matter. The receivers have completed the construction of the bridge since their appointment; thus recognizing its importance to the operation of the property. See the Carnegie Steel Co. Case, 176 U. S., at page 288, 20 S. Ct. 347, 44 L. Ed. 458, and Virginia Passenger & Power Co. v. Lane Bros. Co. (C. C. A.) 174 F. 513, at page 517. And finally the appellants themselves have recognized the propriety of the expenditures made in the erection of this bridge by permitting all claims for supplies furnished for its construction to be paid except these two small claims, one for inspection and the other for cross-ties, which would in all probability have been required if the old bridge had been replaced with one of the same character. Under these circumstances we feel that it would be unreasonable and unjust to deny priority to these two claims, representing such a small fraction of the cost of the improvement. See Pennsylvania Steel Co. v. New York City R. Co. (D. C.) 229 F. 465, 467. A very similar case, in which a claim for supplies furnished for the erection of a bridge, constituting a valuable improvement over one which it replaced, was allowed priority as against the current debt fund but not as against the corpus of the mortgaged property, is International Trust Co. v. T. B. Townsend Brick & Contracting Co. (C. C. A. 6th) 95 F. 850.

For the reasons stated, the order appealed from will be affirmed.

Affirmed.