**UNION SWITCH & SIGNAL CO. v. POWELL et al.**

No. 4021.

Circuit Court of Appeals, Fourth Circuit.

June 8, 1936.

William Booth, of Pittsburgh, Pa. (J. Hume Taylor and Williams, Loyall & Taylor, all of Norfolk, Va., and Smith, Buchanan, Scott & Ingersoll, of Pittsburgh, Pa., on the brief), for appellant.

Thomas O'G. FitzGibbon, of New York City, and W. R. C. Cocke, of Norfolk, Va. (Tazewell Taylor, of Norfolk, Va., Harold J. Gallagher, of New York City, Edward Duffy, of Baltimore, Md., Gordon M. Buck, of New York City, Carlyle Barton, of Baltimore, Md., Theodore S. Garnett, of Norfolk, Va., Humes, Buck, Smith & Stowell, of New York City, Baird, White & Lanning, of Norfolk, Va., Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from an order denying priority under the six months' rule to claims filed by the Union Switch & Signal Company against the receivers of the Seaboard Air Line Railway Company. One of these claims, in the sum of $14,310.60, was for materials and supplies used by the railroad for the installation of remote controlled switches to take the place of hand operated switches at certain of its stations in North Carolina and Virginia. Another, in the sum of $2,110.60, was for materials and supplies used by the rail-

road for the installation at Bladen, Ga., of an automatic interlocking plant at a grade crossing over the line of another railroad. A third, in the sum of $2,353.69, was for materials and supplies which were purchased by the railroad for use in the installation of automatic signals from Brown street to Hermitage in the city of Richmond in connection with the construction of an additional track. The supplies last mentioned were not actually used for the purpose of which they were purchased, but, upon the abandonment of the project, were sent to the general storehouse of the railroad, and it does not appear what ultimately became of them.

The special master denied preferential status to all of these claims on the ground that they represented purchases made for new construction and not for operating purposes. With respect to the claim first above mentioned, he found the facts as follows: "These remote controlled switches were not repairs. They were, although they superseded switches operated by hand, additions and betterments, far exceeding in cost the switches which they replaced; it being stated in the stipulation that the gross cost of the installation of a remote controlled switch is between $11,000 and $12,000, whereas the cost of the installation of a hand operated switch is less than $1,000. The two things are so essentially different, and the one so much more expensive than the other, that I do not think that we can consider the remote controlled switches as other than new construction."

With respect to the interlocking plant, for which materials and supplies embraced in the second claim were purchased, he found: "There had been no such interlocking plant at this point before, nor had there been, before the interlocking plant was installed, any device which was superseded by it. This was purely original construction."

With respect to the materials and supplies embraced in the third claim, his findings were: "The materials and supplies, of which the above sum was the purchase price, were sold and purchased to be used in connection with the proposed installation of automatic signals from Brown Street, Richmond, Virginia, to Hermitage, in connection with the construction of an additional track. The proposed installation of the signals was abandoned, and the original charge of the cost of the materials to Capital Account was changed to

maintenance; it appearing that the materials were of such a character that they were susceptible of being used for either new installation or for operation and maintenance work, and that, when the installation project was abandoned, the materials were sent to the general storehouse and were there commingled with the Railway's stores of a like character, to be withdrawn from time to time as materials of that character might be required. The stipulation does not expressly state what ultimately became of these materials, but I think it fair to assume that they were used for maintenance or operating purposes."

The District Judge affirmed the findings as to all of these matters, saying with respect to the third claim: "It is essential that the consideration for the debt be a current expense of ordinary operation of the railroad necessarily incurred to keep the railroad a going concern. Materials purchased for new construction, as occurred here, do not fall in that class. Mere abandonment of that part of the new construction in which the materials were intended to be used, after they have been purchased, and storing them in the railway's general warehouse, could hardly operate to change the character of the materials from new construction materials to ordinary and necessary operating supplies."

We think that the action of the lower court with respect to the first two claims is clearly in accord with the principles which we laid down in Continental Trust Co. v. W. R. Bonsal. & Co. (C.C.A.4th) 72 F. (2d) 975, 981, wherein we carefully reviewed the law and stated the rules applicable in cases of this character. We held in that case that a debt is not to be denied priority under the six months' rule, if it is for supplies necessary to the continued operation of the road, merely because such supplies have been used in a structure which constitutes an improvement over one which it replaces. But we were careful at the same time to point out that "the basis of the rule is that the bondholder impliedly agrees that the current debts made in the ordinary course of business shall be paid from current receipts before he shall have any claim on the income; and for this reason expenditures for additions and permanent improvements which cannot be fairly regarded as a part of the operating expenses of the road, incurred in the ordinary course of business,

cannot be allowed priority as a charge against income under the rule, for the bondholder has not consented to be improved out of his security."

The finding of the special master that the supplies covered by these claims were not purchases made in the ordinary course of business and necessary to the continued operation of the road, but were for permanent improvements and not ordinary operating expenses, was clearly correct; and, in application of the rule as stated, priority was properly denied.

And we do not think that the situation with respect to the third claim is any different by reason of the fact that the supplies represented by it were not used in the new construction for which they were intended, but were placed in the warehouse and may have been used later for maintenance or operating purposes. To justify granting of priority under the six months' rule, it must appear, not only that the supplies were used by the railroad for operation and maintenance in the ordinary course of business, but also that the debt was incurred as one of the ordinary operating expenses of the road, with expectation that it would be paid out of current earnings or, as said in Virginia & Alabama Coal Co. v. Central Railroad & Banking Co., 170 U.S. 355, 368, 18 S.Ct. 657, 662, 42 L.Ed. 1068, "upon the tacit or express understanding that the current earnings would be appropriated for the payment of the debt." If the debt is not so contracted, the subsequent use for operation or maintenance of the supplies purchased will not give it priority. Here the purchase was for new construction, and it appears that plaintiff knew that new construction was contemplated. There is nothing to show that there was either "tacit or express understanding" that current earnings would be appropriated in payment and that the purchase would not be paid for out of funds to be borrowed or otherwise made available for the new construction or that the sale was not made upon the general credit of the road.

A very similar question was before the Supreme Court in Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 418, 49 L.Ed. 717, where the contention was that a claim for cross-ties furnished the railroad should be allowed as a charge on the corpus of the fund in the hands of the receiver, and that, at all events, the charge should be allowed for the value of such of the ties as were used by the receiver after his appointment. In holding against this contention the court said: "The fact that the receiver used the ties is of no importance. They already were the property of the road, and it was his business to use them. The material point is not the time when they were used, but the time when they were acquired."

There was no error, and the order appealed from will be affirmed.

Affirmed.